UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | NO. 3:22-CR-00340 |
| v. | ) | |
| | ) | JUDGE CRENSHAW |
| MAHAN JANBAKHSH | ) | |
| a/k/a MARK JANBAKHSH | ) | |
| STEVEN L. PIPER | ) | |

### RESPONSE IN OPPOSITION TO DEFENDANT JANBAKHSH'S MOTION TO DISMISS THE INDICTMENT

The United States, by and through its undersigned attorneys, submits this response in opposition to Defendant Janbakhsh's *Motion to Dismiss the Indictment* ("*Motion*"). (Doc. No. 183.) The *Motion* should be denied because it fails to present a valid factual or legal basis for relief.

### INTRODUCTION

Janbakhsh claims there has been a due process violation under *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), because of the Government's alleged failure to preserve evidence—the AMS database—which he believes would have either been exculpatory or potentially useful. (Doc. No. 183, PageID #: 1390.)

As to the facts, Janbakhsh has not alleged that the Government lost any evidence—both sides have had access to the same AMS data and reports. Instead, Janbakhsh alleges a "failure" to collect a particular piece of evidence, though he admits he has no proof of bad faith. (*Id.*, PageID #: 1405-06.) Janbakhsh also fails to support his (entirely self-serving) claim that the AMS database would have somehow exonerated him or been potentially useful. Janbakhsh's assertion that the AMS database had actual or potential exculpatory value is highly dubious—the Government is not aware of any such exculpatory evidence. The best Janbakhsh can do is speculate that the full AMS database *might* enable him to contradict the AMS data and reports that were produced by third

party auditors—but only *if* it turns out that the auditors used flawed data. But, again, Janbakhsh provides no evidence to suggest this is likely. That failure is telling, because Janbakhsh has been provided historical copies of the full AMS database (covering two years of the charged conspiracy), as well as the AMS data and materials gathered by auditors. And yet, Janbakhsh has not identified any discrepancies, nor pointed to anything in the historical copies of full AMS database that would support his hypothesis.

The fact of the matter is that Janbakhsh's arguments about the exculpatory value of the AMS database border on disingenuous. Indeed, the Government has evidence (including recordings of Janbakhsh) to show that when the fraud came to light in 2017, Janbakhsh was actively seeking to *prevent* auditors from reviewing (i) the data in the AMS database, (ii) his own emails, or (iii) the laptop of C.Q., his employee and co-conspirator, because he did not want them to find the fraud.[1] But now that he knows it is unavailable—he claims it is critical to his defense.

All of this is reason enough to deny the *Motion*. But there is an even more fundamental problem. Every Due Process case cited in the *Motion* involved a situation where evidence was *collected* and in the *possession* of the Government—but it was then lost, destroyed, or unpreserved. The Government's possession of the evidence is foundational to a *Trombetta* or *Youngblood* claim, and it is undisputed that the Government did not possess the full AMS database. The *Motion* thus fails as a matter of law, as the Sixth Circuit held in a virtually identical case. *See United States v. Folad*, 877 F.3d 250 (6th Cir. 2017) (rejecting due process claim where private party disposed of ATMs that the government never possessed).[2]

---

[1] Indeed, the *Motion* is particularly audacious, given that the last known location of the physical servers was in the custody and control of the Defendant at Plaza Mariachi offices.

[2] At trial, Janbakhsh is free to make any number of challenges to the evidence. He can attack the Government's investigation for deficiencies (whether real or imagined). He can point out the evidence that the Government did *not* obtain, and contest the admissibility or weight of the

2

## BACKGROUND

The Indictment charges the Defendant in a multi-count Indictment with conspiracy to commit bank fraud and individual counts of bank fraud, making false statements to a bank, bankruptcy fraud, and falsely testifying under oath during and in relation to a bankruptcy proceeding. (Doc. No. 3.) Janbakhsh is also charged with witness tampering for attempting to bribe a former employee, C.Q.

### A. Overview of the Fraud Scheme

As is more fully described in the Indictment, the Defendants' company, Auto Masters, had a line of credit with Capital One. The line of credit required Auto Masters to maintain certain levels of collateral (in the form of accounts receivable on eligible customer car loans) in order to make draws on their line of credit. Auto Masters was required to make a monthly certification, known as the "borrowing base certificate" ("BBC") to Capital One that certified the value of Auto Masters' eligible collateral. Co-defendant Steve Piper emailed these monthly BBCs to Capital One, and Capital One used them to calculate and fund the draws to Auto Masters.

As described in the Indictment, between 2013 and October 2017, the Defendant conspired with others to submit false BBCs to Capital One so that they could take draws on the line of credit that they were not entitled to take. To protect against Capital One discovering the overstated borrowing base, the Defendant instructed others, including C.Q. and R.J., to falsify loan data in the AMS database so that it would support the BBCs. The Indictment does not allege that the Defendant—as the CEO—was *personally* entering fraudulent data into the AMS system. Nor is that what the evidence will show at trial.

---

evidence the Government *did* obtain. Janbakhsh has the information necessary to pursue these arguments at trial, if he so chooses. But they are just that—issues for trial.

The submission of false BBCs continued until October 2017, when the Defendant and co-defendant Steve Piper submitted a BBC to Capital One in which they admitted that they had overstated the Auto Masters borrowing base by $33.1 million dollars. The October 2017 BBC thus acknowledged that the Defendant had been submitting BBCs to Capital One that were inaccurate. This meant that Auto Masters had (fraudulently) obtained approximately $26.4 million dollars from Capital One that they were not entitled to receive.

In an effort to cover their tracks, and prior to disclosing this massive overstatement, the Defendant's co-conspirators deleted evidence of these fraudulent loan payments, including by doing a "hard delete" of records in the AMS database. The deletion of these loan records from the AMS database, in the summer of 2017, occurred before any civil, bankruptcy, or criminal investigation existed.

### B. Capital One Investigation and Bankruptcy

As an initial response to Auto Masters' October 2017 disclosure that it had falsified its collateral by over $33 million, Capital One tasked auditors from Berkley Research Group ("BRG") to investigate the Auto Masters collateral shortage. Later that same month, Auto Masters filed for Chapter 11 bankruptcy. This led to even more scrutiny of Auto Masters' books and records. After Auto Masters filed for bankruptcy, Capital One hired MCA Financial Group ("MCA") to conduct a financial investigation, and MCA was eventually appointed as the bankruptcy receiver. Separately, Auto Masters had hired Steve Curnutte from Tortola Advisors to be the company's Chief Restructuring Officer (CRO) during the bankruptcy. Curnutte worked with the Defendant, co-defendant Steve Piper, and other Auto Masters employees to investigate Auto Masters' overstatement of its collateral.

Each of these third-parties—BRG, MCA, and Tortola Advisors—had access to the AMS

database, including in late 2017 when the fraud was discovered. Each third party also investigated and reported on what they had observed with respect to the falsified loans.

After these consultants and analysts had completed their initial investigations, the parties in the bankruptcy proceeding agreed that the overstatement was not due to an accident or mistake. Instead, as Auto Masters' own attorneys acknowledged, one or more individuals at Auto Masters had been deliberately entering fake payments to inflate the borrowing base.[3] Strangely, the *Motion* laments that the AMS database "would have revealed who accessed and modified loan data, when those modifications occurred, and whether Janbakhsh had any involvement whatsoever." (Doc. No. 183, PageID #: 1389; *see also id.*, PageID #: 1398, 1400.) However, this information was investigated and identified by Auto Masters' CRO, Steve Curnutte, in November 2017. The Defendant has this information, including the 8 user logins identified by Curnutte. None of the identified user logins belonged to the Defendant.

### C. The Criminal Investigation

The U.S. Attorney's Office for the Middle District of Tennessee and the FBI opened a criminal investigation in or around May 2018. As is often the case, the criminal investigation was opened but was not immediately overt (i.e., public), so that potential targets of the investigation (including Janbakhsh) would not be aware of the criminal investigation.

Once the criminal investigation began, various third-parties—including BRG, MCA, and

---

[3] On November 14, 2017, Auto Masters' counsel explained that the cause of the overstated collateral was "an individual or individuals that have gone into the [AMS] software system that manages the inventory and manages the payments, and . . . there has been some manipulation of data to show vehicles that should have been ineligible, they have been -- the data has been manipulated so there has been a payment made, but there's no real evidence of that payment occurring. . . . [i]t appears as though the data has been manipulated in order for the paper to go from being ineligible to eligible." (*See Transcript of Nov. 14, 2017, Hearing*, *In re Auto Masters, LLC*, Case No. 3:17-bk-07036 (M.D. Tenn.), Doc. No. 766, p. 11-13.)

5

Tortola Advisors—provided records to the Government relating to their work with Auto Masters and the Capital One line of credit. These records included the AMS data and reports that they possessed or relied upon in connection with their own investigations. These records provided a wealth of information about Auto Masters and the AMS database, including: sales reports; loan payments; cash sheets, collections, and reconciliations; portfolio details; borrowing base records; loan tapes by Dealer, which were used to identify fraudulent payments; sample contracts; delinquency records; system screenshots; QuickBooks records; notes receivable spreadsheets; and screenshots from the AMS system itself. These records provided the Government with detailed information associated with the falsified loans from AMS, including: the loan numbers of the falsified loans; the dates upon which false payments were posted; the amounts of each of those false payments; and the user IDs that were used to input the falsifications in the AMS system.

Later on, the Government obtained historical copies of the full AMS database from Chad May, which provide a snapshot of the complete database from the earlier part of the fraud scheme (i.e., through roughly June 2015). These historical copies of the AMS database cover approximately two years of the charged fraud scheme. The Government is not aware of any relevant additional data in the AMS database that the Government had not already provided. However, the Chad May historical AMS database copies would certainly show whatever information the defendant claims is not in the voluminous AMS reports and spreadsheets. At the very least, now that he has examined the historical copies of the database, the defendant should be able to identify what data from the "full" AMS database he believes would help his defense.

The Government has provided all of these records to the Defendant. The AMS data the Defendant has is thus identical to the information in the Government's possession. The Government has not possessed or reviewed any additional AMS data that has not been disclosed.

6

In addition to obtaining the above AMS data and reports, the Government worked to identify the participants in the fraud scheme and gather evidence of their involvement. This process not only involved the time-intensive review of the vast troves of documentary and electronic evidence that was obtained, but also locating and obtaining the assistance of witnesses with personal knowledge of the fraud. Even though the Government already had the AMS data and reports that third-party auditors had gathered during their own investigations of the fraud scheme, the Government did inquire about the "full" AMS database. The Government asked AMS itself whether AMS had a copy of the database. But by the time the Government spoke to AMS, AMS no longer had a copy of it. Indeed, it was these continued efforts to obtain evidence (including the AMS database) that eventually led to the discovery of Chad May's historical copies of AMS.

As far as the Government is presently aware, the last known location of the Auto Masters' servers—which would have contained the "full AMS database"—was at Plaza Mariachi, where the Defendant's office was located. (*See, e.g.,* Doc. No. 200, PageID #: 1677-78 (discussing deposition testimony of Auto Masters' Chief Information Officer and other evidence of Defendant's access and control over AMS database in 2017 and beyond).) It is unclear to the Government what happened to those physical servers (and the copy of the AMS database) that was in the Defendant's custody and control. However, the Government has evidence (including recordings of Janbakhsh) to show that when the fraud came to light in or around October 2017, Janbakhsh was actively seeking to *prevent* auditors from reviewing (i) data in the AMS database, (ii) his own emails, or (iii) the laptop of C.Q., his employee and co-conspirator. (*See United States' 404(b) Notice*, Doc. No. 181, PageID #: 1377-78.)

### D. Events Occurring Post-Indictment

Based on the evidence obtained by the Government, the Grand Jury returned an Indictment in this case on October 24, 2022. Approximately one year after the Grand Jury returned the Indictment in this case, in late 2023, the Government retained two employees from one of the third-party auditors, MCA, and identified them as potential expert witnesses. As the Government has repeatedly explained, the MCA witnesses' testimony will be primarily (if not entirely) factual in nature -- describing the first-hand work that they performed, what they found in the AMS records, and the reports they generated. Indeed, the Government's expert notices specifically indicated that "this testimony [will be] more akin to factual testimony under FRE 701." (Doc. No. 68, PageID #: 214; Doc. No. 69, PageID #: 362.) The Government noted that it was identifying the MCA witnesses as potentially providing expert testimony "in an abundance of caution," because of their specialized knowledge, training, and experience in providing accounting and audit services. (*Id.*) Even prior to the expert notice disclosures, the Government had produced the MCA reports to the Defendant in December 2022, and the records underlying their reports were produced in December 2022, February 2023, and June 2023.

Almost a year and a half after the Indictment and discovery was produced, on February 23, 2024, Janbakhsh (through his prior counsel) first asked whether the Government had the full AMS database. On February 29, 2024, the Government confirmed to counsel that it had never possessed the full AMS database, but that it had produced the AMS records it obtained from the third-party auditors in connection with their work. (Doc. No. 84-1, PageID #: 619-20.) The Government explained that, while at some point the third-party auditors may have had access to the full AMS database, the auditors no longer (in 2024) had such access, and that no one had provided a copy of it to the Government. (*Id.*)

8

On April 5, 2024, Janbakhsh (through his current counsel) again inquired about the AMS database and the Government's efforts to collect and preserve it. The Government repeated what it had previously told Janbakhsh's counsel. The Government also asked defense counsel what information he believed was in the "full" AMS database, versus what had been obtained by the Government and produced in discovery. Defense counsel admitted that, actually, he had not yet reviewed any of the discovery materials, and that he did not even have access yet. However, despite this, counsel stated that he planned to file a motion to dismiss the Indictment. A little over a year later, the *Motion* was filed.[4]

ARGUMENT

Defendant's *Motion* fails to establish any due process violation. Although he tries to invoke principles of fairness by suggesting otherwise, the parties have (and always have had) access to the same evidence. The Government never possessed the full AMS database about which he complains. This alone is fatal to the *Motion*. However, Janbakhsh also fails to show that the full AMS database was actually exculpatory or that it is potentially useful to his defense. Indeed, he highlights nothing in the AMS data and reports obtained from it, or from the historical copies of the database that are available to him—he only theorizes on what he might possibly find. In any event, Janbakhsh has absolutely no evidence to indicate that investigators intentionally failed to

---

[4] Though not dispositive here, the Defendant asserts in his reply brief in support of the third discovery motion that the Government has changed its story, because it initially had told the Court that "there simply was no overlap" between when the criminal investigation began and the AMS database still being in existence. (Doc. No. 210, PageID #: 1760.) That is not true. The Government has never said that there was no overlap or that it was not even possible to obtain the AMS database. The Government's consistent position has been that, while it made efforts to obtain the AMS database, it was never able to do so, and that by the time the Government spoke to AMS to see if AMS still had a copy, it was no longer in AMS's possession.

collect the AMS database because they believed it would exonerate Janbakhsh. There is simply no support for Janbakhsh's accusations of bad faith.

### A. "Failure to Preserve" Claims Are for Evidence the Government Possessed.

The Supreme Court has established two separate tests for due process "failure to preserve" claims. The *Trombetta* test applies when the Government fails to preserve material evidence, which had an exculpatory value that was apparent at the time the Government lost or destroyed it. *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015). The second test, *Youngblood*, applies when the government fails to preserve "potentially useful" evidence. *Collins*, 799 F.3d at 569. "[F]ailure to preserve the former violates due process regardless of the government's good or bad faith." *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (cleaned up). "But destruction of the latter offends due process only if done in bad faith." *Id.*

Janbakhsh asserts that "[t]his case presents the precise situation *Trombetta* was designed to prevent: the government building a prosecution on evidence it had access to examine but that the defendant cannot." (Doc. 183, PageID #: 1403.) Nothing about this statement is true.

Fundamental to either "failure to preserve" test is **state action**—that is, that the Government possessed, and subsequently lost, some piece of evidence. In *Trombetta*, officers obtained breath samples while performing a breathalyzer on the defendant, but did not preserve those samples. 467 U.S. at 481.[5] The facts here are nothing like *Trombetta*. The Government did not "build[] a prosecution" on the AMS database—the Government never possessed or even reviewed the "full" database. And the Government has produced all of the AMS data in its

---
[5] Even though police possessed the evidence and allowed it to be destroyed, the Court found no due process violation because (1) the defendant did not show that the evidence possessed an exculpatory value that was apparent before it was destroyed, (2) law enforcement did not destroy the breath sample in bad faith, and (3) the evidence was not of such a nature that the defendant would be unable to obtain comparable evidence by other means. *See id.* at 487-90.

10

possession that it did use.[6] *Youngblood* is also unavailing for the same reason. In that case, law enforcement possessed the clothing of a sexual assault victim, but failed to properly preserve the clothing for later potential blood or DNA testing. *Youngblood*, 488 U.S. at 53-54. Thus, in both *Trombetta* and *Youngblood*, the Government actually possessed the evidence. Not so here.

In any event, *Youngblood* rejected the idea that police have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 57-58. *Youngblood* emphasized that when the state possesses and fails to preserve evidence with only potential exculpatory value, a defendant must show bad faith. *Id.* at 58. The Government is aware of no Supreme Court precedent that affirmatively requires law enforcement to gather a particular piece of evidence, or to use a particular investigative tool. In fact, *Youngblood* specifically noted that it "strongly disagree[d]" with the suggestion that "the Due Process Clause is violated when the police fail to use a particular investigatory tool." *Id.* at 58-59.

But that is what Janbakhsh argues—he says that in addition to obtaining records from the auditors who had already investigated the fraud, the Government should have obtained a search warrant or used other means to go obtain the full AMS database itself. The Sixth Circuit addressed and rejected a virtually identical due process claim in *Folad*, specifically noting that the Government never possessed the evidence, which had been lost/disposed of by a private party. 877 F.3d at 252-53. In *Folad*, the defendants were indicted for stealing $600,000 from an ATM company by reprogramming the company's ATMs to dispense more money than requested. *Id.* at

[6] Janbakhsh's real complaint is that he cannot reproduce the reports and data MCA obtained from the AMS system (or generate other reports of his own). That is also true for the Government. Janbakhsh, of course, can still cross-examine MCA about the absence of the full database and point out that MCA's work is only as reliable as the data upon which it is based.

251. The company discovered the scheme in 2010, conducted its own internal investigation, and provided the information they obtained to federal law enforcement in 2010. *Id.* at 252. Law enforcement did not take possession of the ATMs. Over the next few years, the ATM company replaced the ATMs in the course of their business operations. *Id.* The Government eventually indicted the defendants in 2014. The defendants moved to dismiss the indictment for a due process violation—claiming that the ATM company replaced the ATMs that potentially would have contained exculpatory evidence. *Id.*

The Sixth Circuit affirmed the denial of the motion to dismiss, as well as its underlying premise that the Government is responsible for the actions of a private party that result in the loss of evidence:

> No precedent from the United States Supreme Court or this Court supports the idea that the government violates a criminal defendant's due process rights when a *private party*, with no support from the government and no inducement by the government, fails to preserve relevant evidence.

*Id.* at 252-53 (emphasis in original); *see also United States v. Martinez-Martinez*, 369 F.3d 1076, 1086-87 (9th Cir. 2004) (rejecting due process claim and noting that "[a] failure to collect potentially useful evidence is distinctly different than a destruction of evidence" claim).

The Sixth Circuit added that "[e]ven if we overlooked this problem," the defendant failed to show that the ATMs were exculpatory or that the defendants could satisfy the *Youngblood* standard. *Folad*, 877 F.3d at 253-54 (noting that defendant could only offer "possibilities" of what ATMs may have contained). The court pointed out that there was no evidence the victim corporation "replace[d] the ATMs to hinder Folad or Fattah's defense or to obtain a greater insurance payment." *Id.* at 254. The Court noted in closing that, even if there were a such thing as a due process violation for "failure to collect" evidence (which it did not accept), a defendant

would have to prove the failure to collect the evidence by the government was motivated by bad faith. *Id*. at 255.

Consistent with *Folad*, courts that have been presented the question have routinely rejected the idea that the Government had an obligation to obtain a particular piece of evidence that a defendant later asserts was needed for his defense. *See, e.g., United States v. Faller*, 675 F. App'x 557, 560 (6th Cir. 2017) (rejecting "failure to preserve" claim where the government never possessed a laptop that went missing; defendant could not show the government "owed any duty" with regard to the laptop); *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002) (rejecting *Brady* claim for alleged failure of the government to obtain, and then turn over, audiotapes because "*Brady* does not require the government to gather information or conduct an investigation on the defendant's behalf"; government "did not have the duty to gather the tapes and tender them to the defendant"); *United States v. Avenatti*, 559 F. Supp. 3d 274, 279-80 (S.D.N.Y. 2021) (rejecting defense motion that sought to exclude WhatsApp messages obtained by the government because of alleged "failure" to obtain and produce the messages in their original electronically stored format; government's discovery and disclosure obligations only extend to information in its possession); *United States v. DeLeon*, 426 F. Supp. 3d 1034, 1054 (D.N.M. 2019) (noting that "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess," nor is there any "duty" to obtain evidence from third parties) (internal quotations omitted); *United States v. Patrick*, 2016 WL 6610983, at *1-2 (E.D. Mich. Nov. 9, 2016) (denying motion to dismiss indictment for purported failure to collect evidence sought by the defense).

This rule makes sense. Otherwise, in every case a defendant would be motivated—and have the benefit of hindsight—to point out evidence that law enforcement "could" or "should"

have obtained. As one district court observed in rejecting a due process claim, nothing requires the Government to prove its case "through direct – as opposed to circumstantial – evidence," and "[i]f there are weaknesses in the Government's case . . . then it is the job of the defense attorney to identify these weaknesses on cross-examination and during the presentation of Defendant's case." *Patrick*, 2016 WL 6610983, at *2. There is no due process issue here because the Government never possessed the AMS database. The *Motion* should be denied for this reason alone.

### B. *Janbakhsh Does Not Show that the AMS Database Contained Exculpatory or Potentially Exculpatory Information, and Comparable Evidence Exists.*

Even if the due process clause could be read so broadly as to create an affirmative duty requiring the Government to collect evidence, the Government is aware of no exculpatory or potentially exculpatory evidence that would have been in the AMS database. During its investigation, the Government amassed, from multiple sources, a voluminous amount of data, reports, and spreadsheets pulled from the AMS database. The Government also separately obtained historical copies of the AMS database. All of this evidence has been provided to the defense.

By the time the criminal investigation began in mid-2018, it is not even clear what other information would have been found in the then-current version of the AMS database (beyond what auditors had already pulled).[7] The Defendant speculates as to several ways the full AMS database *might* have been useful: to explore the possibility MCA has mischaracterized the loan data by only pulling "selective extracts" from the AMS database; to look at user logs to see who accessed the AMS database to make false payments; to check user logs and "permission levels" that might show that Janbakhsh did not make the false entries; to investigate the possibility a "January 2018 virus . . . may have altered data without human intervention"; to document any "unauthorized system

---

[7] Indeed, the *Motion* conveniently ignores that the Defendant and his co-conspirators deleted evidence of the fraud from the AMS database in 2017.

14

acess" by his co-conspirators and others; to potentially identify inaccuracies in MCA's work; or to show that "the allegedly fraudulent entries" were actually "routine and legitimate." (Doc. No. 183, PageID #: 1396-97.)

Most of these are pure speculation, as Janbakhsh presents no reason to believe that the AMS database would *actually* or even *likely* lead to the discovery of something new. And as for Janbakhsh's purported interest in user logs, this argument is nothing but a red herring. The Government has never contended that Janbakhsh *personally* posted fraudulent payments in AMS. But, in any event, back in November of 2017, Steve Curnutte identified usernames that were used to access AMS and post false payments. In other words, the Defendant already has information about the user logs. And, to the extent any other types of "logs" or access history exist in AMS, Janbakhsh has historical copies of the AMS database covering two years of the fraud scheme. Despite this, Janbakhsh points to nothing in these historical copies of the AMS database to support his counsel's claims. The Defendant's speculation and self-serving claims do not establish that there was anything exculpatory or even potentially exculpatory in the AMS database. And, further, the *Motion* ignores all of the other comparable evidence—much of which he already possesses—that would permit him to make his investigation and arguments.

      C.      ***There is No Evidence of Bad Faith.***

Finally, even if law enforcement could theoretically be held accountable for failing to obtain evidence and even if the AMS database were potentially useful under *Youngblood*, Janbakhsh has not presented any evidence of bad faith.

The Sixth Circuit has held that in "failure to preserve" situations where "the government is negligent, even grossly negligent, . . . the bad faith requirement is not satisfied." *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001). This is because the bad faith requirement limits

15

Case 3:22-cr-00340   Document 216   Filed 06/09/25   Page 15 of 17 PageID #: 1819

"police's obligation to preserve evidence to reasonable bounds," confining it to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58. The bad faith inquiry "necessarily[s] turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.*. Courts thus look for evidence of a "calculated effort to circumvent [*Brady*'s] disclosure requirements," "official animus," or a "conscious effort to suppress exculpatory evidence." *United States v. Generett*, 149 F. App'x 432, 435 (6th Cir. 2005) (citations omitted).

Here, there no evidence that law enforcement *intentionally* avoided locating and seizing a copy of the full AMS database, and certainly no evidence that agents did not obtain the AMS database *because* they thought it would exculpate the Defendant. The Court recently noted the absence of anything to support a "bad faith" allegation when it denied Janbakhsh's discovery motion. (Doc. No. 172, PageID #: 1087-88.) And the Defendant's own *Motion* reluctantly still admits as much. (Doc. No. 183, PageID #: 1405-06.) Indeed, the Government's continued investigation—which led to the location, collection, and production of historical copies of the AMS database in April 2024—belies the "suggestion" that the Government intentionally was avoiding the AMS database because it was somehow exculpatory. There is no evidence of bad faith, because there was none.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully submits that Janbakhsh's *Motion* should be denied, as it is legally and factually unsupported.

Respectfully submitted,

ROBERT E. MCGUIRE
Acting United States Attorney for
the Middle District of Tennessee

<u>BY: *s/ Kathryn W. Booth*</u>
KATHRYN W. BOOTH
CHRIS SUEDEKUM
Assistant U. S. Attorneys
United States Attorney's Office
719 Church Street, Suite 3300
Nashville, TN 37203
Kathryn.Booth@usdoj.gov
Chris.Suedekum@usdoj.gov