IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MAHAN JANBAKHSH, )<br>)<br>a/k/a MARK JANBAKHSH, )<br>)<br>and STEVEN PIPER, )<br>)<br>Defendants. ) | Case No. 3:22-cr-00340 |

### DEFENDANT JANBAKHSH'S
### MOTION TO CONTINUE TRIAL

Defendant Mahan "Mark" Janbakhsh respectfully moves this Court for an order to continue the trial in this matter by no less than ninety (90) days. The trial in this matter is currently scheduled for July 22, 2025. But it cannot proceed on that date without violating his constitutional rights.

### SUMMARY

At 4:29 p.m. yesterday, only 13 days before trial, the government produced **77,805 pages** of what it described as Jencks Act and *Giglio* material for the forty-one (41) witnesses it disclosed the day before. This massive last-minute disclosure creates an insurmountable burden that makes effective trial preparation impossible. But it does not stand alone: the continued absence of materials that the defense team has sought via subpoena (Dkt. 296), and the fact that the government has continued to withhold key documents, which the defense team learned only yesterday, makes a

continuance necessary. Simply put, requiring Janbakhsh to proceed to trial on July 22 would violate his constitutional rights under the Due Process Clause.

Having reviewed just a fraction of the newly produced materials for just a matter of hours, counsel for Janbakhsh already can ascertain that he will need far more than two weeks to review the new materials so that they can be effectively used at trial. The scope of this review is hard to comprehend: If the government had produced these documents in paper form, the stack would stand more than twenty-five (25) feet tall. Given this volume, if counsel worked 24 hours per day between now and the start of trial, and took no breaks to sleep or eat, he would have less than 15 seconds to review each page. That is not physically possible, let alone constitutionally sufficient.

But the reality is far worse. Between now and the first day of trial, defense counsel must (i) respond to six motions *in limine* by Thursday; (ii) attend *Daubert* hearings currently scheduled for Wednesday, Thursday, and Friday of this week; (iii) attend the Pre-Trial Conference scheduled for next week; (iv) arrange witness travel; and (v) conduct all other aspects of trial preparation—from finalizing opening statements, drafting witness outlines for the forty-one (41) witnesses the government just disclosed, and finalizing trial strategy. Assuming that sleeping and eating will leave counsel with 16 hours per day to only review documents (and do *none* of these other tasks), the actual time available for document review is drastically reduced, leaving counsel with less than 5 seconds to review each page of this last-minute production.

Worse yet, the government has made this review an even harder task than the volume of materials alone suggests. It provided more than 77,805 pages without any Bates stamps, without any index, and (as to the purported Jencks Act material) without any grouped reference to the relevant witness. The government simply gave the defense a copy of a digital file folder on a DVD disc that contained hundreds of files with assorted names, consisting of tens of thousands of pages, with no rhyme nor reason to the naming convention or any warning that a document contains one page or ten thousand—basically, a digital haystack.

Despite Janbakhsh's repeated requests for timely disclosure dating back to the inception of this case, the government has engaged in deliberate tactical delay, creating an insurmountable burden that makes effective trial preparation impossible and constitutes a flagrant violation of his due process rights. This massive last-minute disclosure forces him to choose between proceeding to trial unprepared or seeking a continuance. And that unconstitutional choice is compounded by the fact that Janbakhsh remains unable to access critical defense materials due to the Court's prior order denying him the ability to subpoena hundreds of other relevant documents he needs to present his defense via a pretrial Rule 17(c) subpoena. (Dkt. 275). As it stands, Janbakhsh has served *new* trial subpoenas under Rule 17(a) for those documents, meaning that—if the subpoenaed parties comply—his defense will not receive those documents until the first day of trial, compounding the time-crunch issues that the government's last-minute production has caused. None of this is consistent with due process or a fair trial.

A continuance is necessary.

## ARGUMENT

I. **The Due Process Clause does not permit the Government to dump 77,805 pages of documents on the defense 13 days before trial.**

Late on July 8, 2025, just thirteen days before trial, the government produced 77,805 pages of what it described as Jencks Act and *Giglio* material. This massive disclosure creates an impossible burden for defense counsel and fundamentally violates Janbakhsh's constitutional right to effective assistance of counsel and due process.

The sheer volume of this production cannot be meaningfully reviewed, analyzed, and incorporated into trial strategy in thirteen days. At a conservative estimate of two minutes per page for initial review, this production would require over 2,500 hours of attorney time. Even working around the clock, defense counsel cannot adequately prepare for trial with this material.

This is not merely an inconvenience—it is a constitutional offense. The Sixth Circuit has clearly stated that Jencks materials must be disclosed "in time for use at trial." *United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988). In complex fraud cases, courts have recognized that "in time for use at trial" often necessitates disclosure *well in advance* of the trial date. *See United States v. Mills*, No. 16-cr-20460, 2019 WL 549171, at *3 (E.D. Mich. Feb. 12, 2019) (ordering disclosure of *Brady* material sixty days before trial because of case complexity). The Department of Justice's own policy recognizes this principle: "Due process requires that disclosure of exculpatory and impeachment evidence material to guilt or innocence be made in

sufficient time to permit the defendant to make effective use of that information at trial." Justice Manual § 9-5.001(D) (emphasis added). So, the obligation to ensure materials are produced to a defendant in time for meaningful use at trial falls to the individual Assistant United States Attorneys in a case. That obligation has not been met here, and a continuance is necessary to remedy it.

Courts across the country have found continuances necessary following similar government discovery dumps on the eve of trial. *See, e.g., United States v. Holmes*, 722 F.2d 37, 40 (4th Cir. 1983) (reversing convictions and ordering a new trial after the district court provided only a short recess following the government's production of Jencks material "eight inches thick, including a thousand pages" of documents the day before trial, which "the government d[id] not dispute" "took an experienced attorney twenty-four hours to read"); *United States v. Govey*, 284 F. Supp. 3d 1054, 1062 (C.D. Cal. 2018) (continuing trial after the government "dumped 75,000 material documents" on the defendant the week before trial "in a manner that demonstrated blatant indifference and reckless disregard for Defendant's ability to use the materials at trial," emphasizing that defense counsel did not possess "superpowers" to review the documents in a week); *United States v. Flores-Duran*, 531 Fed. Appx. 348, 351–52 (4th Cir. 2013) (affirming trial continuance after government produced "over one thousand pages of additional discovery" the week before trial); *United States v. Archbold-Manner*, 581 F. Supp. 2d 22, 25 (D.D.C. 2008) (continuing trial because the government "dumped a massive amount of discovery" totaling over 10,000 pages three weeks before trial so that "the defendants now have

5

an opportunity to use the discovery in their defense"); *United States v. Canchola*, 623 F.Supp.3d 759, 765 (N.D. Tex. 2022) (government's production of 215 hours of audio recordings 39 days before trial "warrants a continuance").

## II. The volume and timing of the Government's disclosure create prejudice that can only be cured by a continuance.

This is a complex fraud case involving an eight-year investigation with multiple government cooperators. The 77,805 pages of late-disclosed discovery undoubtedly contain critical impeachment evidence, witness statements, and other materials essential to cross-examination and defense strategy. Reviewing this material requires more than cursory examination—it demands careful analysis to identify inconsistencies, impeachment opportunities, and exculpatory evidence.

The timing of this production forces Janbakhsh into an impossible choice: either proceed to trial without adequate preparation or seek a continuance that could have been avoided had the government disclosed this material earlier. The government's strategic withholding appears designed to compress Defendant's preparation time and gain an unfair advantage.

The Sixth Circuit has long recognized that, although there is no obligation to disclose *Jencks* Act material before trial, the "better practice . . . is for the government to produce such material *well in advance* of trial so that defense counsel may have an adequate opportunity to examine that which is not in dispute and the court may examine the rest in camera, usually in chambers." *United States v. Minsky*, 963 F.2d 870, 876 (6th Cir. 1992) (emphasis added). Thirteen days to review 77,805 pages of materials—which would require reading four pages a minute, 24 hours a day, until

trial starts (excluding attending any hearings or any other work preparing for trial)—is not an "adequate opportunity" to meaningfully review this evidence.

### III. Even upon cursory review, the Government's disclosure reveals that it has suppressed *Brady* information for over a year.

After reviewing the government's discovery dump for less than an hour, undersigned counsel already has identified three pieces of *Brady* evidence that are critical to Janbakhsh's trial defense, which the government suppressed for more than a year. Janbakhsh cannot make effective use of this information at trial in 13 days.

After a review of only two documents, counsel has learned that the government suppressed *Brady* information for at least the past fifteen months about (1) the fact that the $10,000 cash that Janbakhsh provided to Christian Quiroz was meant to hire an attorney, not (as the indictment alleges) for Quiroz to flee the country; (2) that there are discrepancies in the audio recordings that Ron Janbakhsh purportedly made between him and the defendant and then later gave to the government; and (3) Ron Janbakhsh was involved in his own fraudulent scheme involving the sale of used cars in Florida at the same time as the indicted fraud.

This information is neither Jencks nor *Giglio*, and it should have been disclosed long ago as *Brady*. Consider this hypothetical: If neither Ron nor Christian testified, would Janbakhsh be entitled to know these three facts, all of which undermine the government's case? Unequivocally, yes. By withholding that information until now, the government has sought a strategic advantage at the cost of Janbakhsh's due process rights—and plainly violated *Brady*. In turn, all three pieces of information are grounds for a motion to dismiss under *Brady* and this

7

Court's standing *Brady* order.[1] And all of them require additional investigative efforts for the defense team to use effectively at trial—efforts that cannot be completed in 13 days. Consider each in turn:

1. Quiroz and the $10,000 "Cash Payment"

The indictment alleges that Janbaksh gave him "a cash payment of $10,000, and promis[ed] to pay [Christian Quiroz] an additional sum of approximately $300,000 if he would leave the jurisdiction." (Dkt. 1 at ¶ 36.) But, according to the discovery production, the government has known since at least August 23, 2022— nearly three years ago—that Quiroz understood Janbakhsh was providing him with $10,000 to pay an attorney, not to flee. Specifically, according to a report the government disclosed for the first time in its document dump, "QUIROZ was not surprised MARK gave him $10,000 since at their first meeting at Cinco de Mayo[,] MARK talked about giving QUIROZ money to pay an attorney. *QUIROZ took this cash to be money for the attorney.*" (emphasis added).

This is plain and obvious *Brady* information, which exculpates Janbakhsh of the charged crime—not *Giglio* that simply impeaches a witness's testimony. In fact, *it does not impeach Quiroz at all*. The only thing it impeaches is the indictment and

---

[1] This delay also violates the Court's standing *Brady* order, Dkt. 12, which ordered the government to produce *Brady* evidence "promptly upon discovery." The Court's order warned the government that failure to disclose *Brady* material "in a timely manner" may result in "dismissal of the indictment." Because trial begins in 13 days, Janbakhsh is forced to move for a continuance, a lesser sanction, but reserves the right to move for dismissal of the indictment, which he will do promptly if counsel believes it appropriate after research and review.

the prosecutors' subsequent representations.[2] Even if Quiroz did not testify, Janbakhsh would be entitled to learn facts that undermine the indictment. Here, those facts are that the recipient of the alleged obstructive bribe charged in Count 18 did not believe the "bribe" was anything of the sort. This is not *Giglio*; Quiroz never changed his story. This is *Brady* that should have been provided literally years ago.

If the *Brady* information had been disclosed years ago, as it should have been, the defense team could have taken multiple steps to use it to Janbakhsh's advantage, including by calling witnesses and subpoenaing records about it. In fact, almost a month ago, Janbakhsh attempted to subpoena information about the payment of Quiroz's payment of legal fees from both Quiroz and his attorney. (*See* Dkts. 225-1 at 4–5, 226-1 at 4.) These subpoenas sought to determine whether he had spent the $10,000 on an attorney rather than on efforts to flee. But the Court quashed those subpoenas. (Dkt. 275.) Had the defense team had this *Brady* information years ago, it could have more easily demonstrated to the Court the clear relevance and importance of such records.

Given the Court's order, Janbakhsh reissued subpoenas for the same documents as trial subpoenas with return dates on the first day at trial. Thus, he presently expects to receive documents relevant to this contradiction on the first day

---

[2] Bizarrely, the government has suggested at every turn, including in its most recent 404(b) notice, that the $10,000 at issue was the first installment of a $310,000 payment to "leave the jurisdiction." *See* Government's 404(b) Notice, Dkt. 181 at 6 ("Further, the indictment also charges Mark Janbakhsh with witness tampering in April 2022 for giving Quiroz a $10,000 cash payment and promising Quiroz an additional $300,000 if he would leave the jurisdiction, in an attempt to prevent Quiroz from telling federal agents about the crimes."). Instead—the defense learns now— the witness in question has told the government the exact opposite. It is unclear how the prosecutors involved could make this allegation consistent with their ethical obligations of candor to the court.

9

of trial. A constitutionally-sound investigation into a contradiction of the indictment cannot occur mid-trial. A continuance is necessary on this ground alone.

2. <u>Discrepancies in Recordings Made by Ron Janbakhsh</u>

This is not the only *Brady* dumped on the defense last minute. In an interview with the FBI on April 17, 2024, Ron discussed the recordings he allegedly made of Janbakhsh, which are central to the government's case. Ron, however, "could not explain the discrepancies in the recording lengths from the recordings extracted directly from his phone to the recordings provided to the government via thumbdrive." Based on this report, it appears that agents on the prosecution team learned that there were discrepancies between versions of the same recordings—that the ones the government found on Ron's phone do not match those he gave to the government on a thumb drive. This is a critical issue that calls into question the reliability of those recordings. But the government has never mentioned the problem to the defense before this disclosure. Rather, this one document among 77,805 pages is the first time the government has disclosed (obliquely, through a question to Ron) the "discrepancies" between the recordings Ron originally provided to the government and the recordings that were later extracted from his phone.

This is no small matter. Although Janbakhsh has retained an expert to evaluate Ron's cell phone, and this expert discovered evidence of the deletion of audio recordings on that phone, the defense team did not ask the expert to evaluate any distinctions between versions of the same audio recording—because the defense did not know there was an issue to examine. Now, armed with this information, the

defense team will need to task its expert to conduct this analysis, which cannot be done in a manner to be useful at trial in 13 days.

Here, again, information suggesting that a key piece of government evidence was manipulated and untrustworthy is classic *Brady*. The government believes these recordings inculpate Janbakhsh. *At least* fifteen months ago, prosecutors learned of, in its agents' words, "discrepancies" in the recordings. This information is clearly favorable to Janbakhsh and material to his guilt or innocence. Yet the government waited until thirteen days before trial (and *at least* fifteen months after learning of it) to disclose this information to Janbakhsh. It had no reason to do so, as this information is neither Jencks nor *Giglio*. This violates Janbakhsh's constitutional right to due process and further supports the request for a continuance.

3. Ron's Fraudulent Florida Dealership Scheme

In the same April 17, 2024 interview, Ron Janbakhsh stated he had a "deal" with "Diego" "to start a car lot in Milton, FL." The "deal" involved Ron "sell[ing] repossessed vehicles from his Auto Masters Lots" to Diego who would resell them at the Florida dealership. Ron "sold Diego approximately 35–40 vehicles in this manner." Ron "was not aware that Capital One was going to review the credit line and these vehicles had been listed as collateral on the line."

This is the first time that the government has disclosed to the defense Ron's fraudulent Florida dealership scheme, where he resold vehicles from Auto Masters to his own secret Florida dealership he had with Diego, but kept the vehicles listed as collateral on Capital One's line of credit to Auto Masters. This scheme is, again,

classic *Brady*, as it suggests that Ron was independently of Mark defrauding Capital One, which is one of the charged crimes in the indictment.

Janbakhsh must be allowed to independently investigate this scheme. For example, the defense team will need to locate documents and witnesses that corroborate this arrangement and explain its scope. He also must confirm the extent of Ron's side arrangement and any other, similar schemes involving Ron—particularly because Ron is the government's star cooperator.

Again, Janbakhsh attempted to subpoena information about Ron's involvement in car dealerships in Florida as far back as February of this year but faced resistance because of information his defense team did not know. The February subpoena requested, among other things, that Ron produce records related to his "efforts to set up auto dealerships and related entities in Florida." (Dkt. 163-7 at 7.) In response to that subpoena, David Raybin—Ron's counsel—represented in a letter that "[Ron] has never owned, nor does he currently own any 'auto dealerships and related entities in Florida.'" This was a misleading response, but Janbakhsh's counsel did not know it at the time—because the government had not disclosed the dealership arrangement. If Janbakhsh had known in February 2025 what the government knew in early 2024, he would have immediately moved to compel production and long ago received the requested documents. He does not have them now, 13 days from trial.

Nonetheless, Janbakhsh again attempted to subpoena information about Ron's involvement in other car dealerships in May. But, like the Quiroz subpoena, the Court quashed this subpoena as insufficiently specific. (Dkt. 275.) If the government had

12

Case 3:22-cr-00340   Document 301   Filed 07/09/25   Page 12 of 19 PageID #: 4151

not hidden the fact that Ron set up a separate car dealership in Florida during the charged conspiracy, Janbakhsh could have made much more specific requests for documents and assured the Court that the requests were not a "fishing expedition." (*Id.* at 15.) Now, Janbakhsh's requests for the subpoenas are clearly relevant, and he can make them as specific as necessary. The Court should grant the continuance to allow him the unimpeded access to exculpatory documents that he is entitled.

In sum, in just the first hours of review, undersigned counsel have found *Brady* evidence that is crucial to Janbakhsh's defense that will require more than 13 days of investigation for effective use at trial. There is no telling what else counsel will discover in the remaining hundreds of documents and tens of thousands of pages. But what counsel already has found is enough to require many weeks of defense work. Denying Janbakhsh a continuance would prevent him from thoroughly conducting an independent investigation of the government's discovery dump that violates his due process rights.

**IV.   It also appears that the Government continues to withhold relevant and discoverable documents.**

The government's discovery failures continue beyond suppressing *Brady*. Just hours before the government's massive disclosure, defense counsel learned of evidence that the government has failed to provide. During a meet-and-confer call with cooperating witness Ron Janbakhsh's counsel, David Raybin, regarding defendant's recent subpoena, Mr. Raybin revealed evidence that exposes the inadequacy of the government's disclosures.

13
Case 3:22-cr-00340     Document 301     Filed 07/09/25     Page 13 of 19 PageID #: 4152

During the call, Mr. Raybin admitted he sent the government a letter describing recordings his client made of defendant Mark Janbakhsh. According to Mr. Raybin, the letter describes the contents of these recordings, along with statements by Mr. Raybin indicating that the recordings would be useful to the government's case. This correspondence was part of his client's cooperation efforts against defendant.

This letter should have been provided under *Giglio* and Rule 16. As correspondence from cooperating counsel describing evidence purportedly favorable to the prosecution, it bears directly on the witness's credibility and the scope of his cooperation—classic *Giglio* material requiring immediate disclosure. And under Rule 16(a)(1)(E), the government must produce documents material to preparing the defense or intended for use in the government's case-in-chief. A letter from cooperating counsel describing recordings useful to the government's case plainly falls within this category.

Even if the government took the position that this letter constituted Jencks Act material so that it could delay disclosure, it still failed to produce it. Based on undersigned counsel's targeted review, the letter does not appear in the government's production. A search of today's 77,805 documents using the term "Raybin" does not find the letter. This preliminary review suggests the government failed to search systematically for a critical category of evidence: the prosecutors' correspondence with defense counsel for the cooperating witnesses.

The omission reveals the government's flawed approach. If the AUSAs missed correspondence from cooperating counsel—obvious *Brady*/*Giglio* material that any prosecutor should immediately recognize—their discovery process was fundamentally inadequate. And after further targeted review, it appears that the government conducted no systematic review of email correspondence with cooperating witnesses' counsel, as none appears to exist in the voluminous disclosure. It also seems the government failed to examine paper files for exculpatory material.

As a result, thirteen days before trial, defendant must now review 77,805 pages of newly produced documents while awaiting additional discovery that should have been provided months ago. The government's approach has transformed defendant's trial preparation into an exercise in damage control rather than meaningful case preparation. The government cannot satisfy its constitutional obligations by drowning the defense in documents while, at the same time, failing to disclose material evidence.

V. **In addition, Janbakhsh will require additional time to review the documents produced in response to his trial subpoenas.**

Materials that Janbakhsh has sought via subpoena remain outstanding, and their continued absence, coupled with the government's eleventh-hour production of Jencks and *Giglio* material, renders adequate trial preparation impossible and further infringes Janbakhsh's constitutional rights.

*First*, as detailed in his Motion for Reconsideration of Order Quashing Subpoenas filed on July 7, 2025 (Dkt. 296), Janbakhsh is entitled to pretrial production of thousands of pages of critical evidence from the seven different parties

for whom he has reissued subpoenas for trial. These subpoenas seek thousands of pages of documents from seven different parties, including: (i) Communications between government cooperators and third parties regarding the alleged fraud; (ii) Financial records spanning multiple years from entities allegedly connected to the charged conduct; (iii) Immigration and travel records; (iv) Attorney-client communications regarding forensic data extraction and digital recordings; and (v) Banking and business records from Florida entities established during the relevant time period.

These materials are not merely helpful; they are essential to Janbakhsh's defense strategy and directly relate to the alleged fraud, the credibility of government witnesses, and the very entities the government claims were used in the fraud scheme. For all the reasons stated in his reconsideration motion, which Janbakhsh specifically incorporates herein, these materials should have been produced before trial. The sheer volume of materials sought—conservatively estimated at several thousand pages—was the primary reason Janbakhsh requested pretrial production under Rule 17(c). As Janbakhsh explained in his briefs in response to the motions to quash, meaningful review and analysis of this evidence requires substantial time to identify the trial uses of these materials. Janbakhsh initially sought pretrial production for these subpoenas, but the Court denied that effort. (Dkt. 275.)

*Second*, even if this Court were to uphold its prior order and deny reconsideration, Janbakhsh has now served Rule 17(a) trial subpoenas for many of these same materials. This fallback position, while preserving Janbakhsh's

constitutional right to compulsory process, creates an additional insurmountable burden. Under the current trial schedule, these subpoenaed materials will not be produced until the first day of trial. When these materials are produced on the first day of trial, Janbakhsh will face the impossible task of reviewing thousands of pages of critical evidence while simultaneously conducting jury selection and presenting his defense. This creates the same constitutional violation that he has repeatedly warned about regarding the government's Jencks production—the compression of preparation time to an unconstitutionally inadequate period.

The timing creates a constitutional impossibility. Janbakhsh cannot effectively review 77,805 pages of Jencks and *Giglio* material in thirteen days while simultaneously preparing for trial, and he certainly cannot do so while also reviewing thousands of additional pages of subpoenaed materials that will arrive on the courthouse steps once trial has begun. The subpoena recipients' obstructive tactics (and failure to comply with Local Rules) have significantly hampered Janbakhsh's ability to obtain crucial evidence, thereby warranting a continuance to allow for the proper acquisition and review of these essential defense materials.

The timing problem is compounded by the fact that the materials requested via subpoena directly relate to the 77,805 pages of Jencks material the government just produced. Cross-referencing and analyzing the relationships between the government's evidence and the subpoenaed materials requires careful preparation that cannot be accomplished during trial proceedings.

Moreover, some of the materials subpoenaed for trial may reveal the need for additional witnesses or evidence that Janbakhsh cannot identify until he reviews the productions. The current, compressed timeline would deny him the opportunity to follow up on leads and effectively prepare to rebut the Government's case.

The Court's quashing of the pretrial subpoenas, while subject to reconsideration, demonstrates the very problem that Janbakhsh sought to avoid: the concentration of massive document review into the trial period itself. A continuance would allow adequate time for document production and review regardless of whether the materials are produced before trial or at trial, ensuring that Janbakhsh can exercise his constitutional right to compulsory process without compromising his ability to present an effective defense.

## VI. No Prejudice to the Government; Substantial Prejudice to Defendant

The Government will suffer no prejudice from a continuance. The case has been pending for years, and the government chose the last-minute timing of its Jencks production—timing that dozens of other U.S. Attorney's Offices across the country have forsworn to avoid exactly the problem addressed here. By contrast, Janbakhsh faces irreparable harm if forced to proceed without adequate time to review nearly 78,000 pages of critical evidence.

The alternative—proceeding to trial with inadequately reviewed Jencks material—would result in ineffective assistance of counsel and the denial of due process. Counsel cannot provide constitutionally adequate representation when forced to review such voluminous materials in an impossibly compressed timeframe.

## CONCLUSION

The Government's production of 77,805 pages of Jencks and *Giglio* material just thirteen days before trial creates an insurmountable burden that violates Defendant's constitutional rights. No defendant should be forced to trial under such circumstances. Accordingly, Defendant respectfully requests that the Court continue the trial by no less than ninety (90) days to allow adequate time for review and preparation.

Date: July 9, 2025

Respectfully submitted,

*/s/ J. Alex Little*
J. Alex Little (TN BPR #29858)
Zachary C. Lawson (TN BPR #36092)
John R. Glover (TN BPR #37772)
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co | zack@litson.co | jr@litson.co

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2025, a true and correct copy of the foregoing has been served via the Court's CM/ECF system upon all counsel of record.

*/s/ J. Alex Little*