IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-340-1 |
| v. | ) | |
| | ) | Judge Crenshaw |
| MAHAN JANBAKHSH | ) | |
| a/k/a MARK JANBAKHSH | ) | |

**SENTENCING MEMORANDUM ON BEHALF OF THE UNITED STATES**

The United States, by and through United States Attorney Braden H. Boucek and Assistant United States Attorney Chris Suedekum, hereby submits this sentencing memorandum on behalf of the United States in advance of the Defendant's sentencing on January 23, 2026.

On October 24, 2022, Defendant Mahan ("Mark") Janbakhsh was charged with sixteen crimes by a federal grand jury. (D.E. 3.) All of the crimes stemmed from a sustained, multi-year effort by the Defendant and others to defraud Capital One—the bank who had extended his companies (collectively known as "Auto Masters") a multi-million-dollar line of credit. The Defendant's three co-conspirators, Steve Piper, Christian Quiroz, and Ron Janbakhsh, were also charged for their participation in the fraud scheme; all three pled guilty.

The Defendant elected to proceed to trial in the summer of 2025. On August 14, 2025, Mark Janbakhsh was convicted by a jury of fifteen counts: conspiracy to commit bank fraud, which spanned from at least 2013 to 2017; five counts of bank fraud; five counts of making false statements to a bank; two counts of bankruptcy fraud; and two counts of making false statements in connection with a bankruptcy proceeding.[1]

---

[1] Janbakhsh was acquitted of one charge, Count 18, for witness tampering on or about April 14, 2022, during a meeting with Christian Quiroz.

At trial, the Government proved that the Defendant and his co-conspirators had conspired to defraud Capital One, ultimately obtaining more than $24 million dollars as a result of the fraud. Once the fraud was discovered in 2017, Capital One engaged in protracted efforts—involving bankruptcy proceedings, a state court receivership action, and separate civil lawsuits—to recoup the money stolen by the Defendant and others. Despite these efforts over the past nine years, Capital One is still currently owed more than $11 million dollars.

As set forth in the PSR, Janbakhsh's Total Offense Level is 39, which results from the following guideline calculations: 7 is the base offense level; 20 levels are added for the loss amount of $24 million; 2 levels are added for the Defendant's misrepresentations/fraud during the course of a bankruptcy proceeding; 2 levels are added because the offense involved the use of sophisticated means; 2 levels are added because the Defendant derived more than $1 million in gross receipts from a financial institution; 4 levels are added because the Defendant was the organizer/leader of the scheme; and 2 levels are added for the Defendant's (numerous) attempts to obstruct justice. Janbakhsh has no prior convictions, resulting in a Criminal History Category of I. Based on these calculations, Janbakhsh has an advisory guideline range of 262-327 months. The Government does not have any objections to the PSR. In the Government's Position on the Presentence Report, the United States has separately addressed the Defendant's objections contained in the PSR Addendum.

The United States respectfully requests the Court impose a sentence of 180 months, with a 3-year term of supervised release to follow. The United States further requests the Court order restitution in the amount of $11,272,521.20,[2] enter an order imposing forfeiture money judgments

---

[2] The PSR lists a restitution amount of $16,022,521.20, which was current as of December 17, 2025. After that date, on December 29, 2025, Capital One received an additional disbursement of $4.75 million from the sale of Plaza Mariachi, which had been the subject of a separate bankruptcy proceeding.

as set forth in more detail in the Government's separate filing, and order Janbakhsh to pay $1,500 in mandatory special assessments.[3]

I. **CONSIDERATION OF THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a)**

While a sentencing court must start any sentencing procedure with a calculation of the applicable Guideline range, the court must then consider the argument of the parties and factors set forth in 18 U.S.C. § 3553(a). *See Peugh v. United States*, 569 U.S. 530 (2013). Pursuant to 18 U.S.C. §3553(a), a court shall consider the following factors, among others, when sentencing a defendant: the nature and circumstances of the offense and the history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to afford adequate deterrence to criminal conduct; and the need to protect the public from further crimes of the defendant. *See* 18 U.S.C. §3553(a)(1), (2)(A)-(C). The Government's analysis of these factors is set forth below.

　　1. <u>Nature and Circumstances of the Offense</u>

The PSR accurately summarizes the Defendant's criminal conduct. The Court, having presided over the Defendant's trial, is familiar with the extensive trial record and evidence that resulted in the Defendant's convictions. The Government provides an overview of the nature and circumstances of the Defendant's offense conduct below.

　　　　　　　　*__Auto Masters' Business Model and the Capital One Line of Credit__*

The Defendant was the CEO and majority owner of Auto Masters, which was comprised of a group of car dealerships and related finance companies. Auto Masters' business model involved selling used cars and offering financing to buyers. The Defendant owned 100% of several

---

[3] The Defendant has the financial means to pay a fine. However, in light of the Defendant's remaining substantial financial obligations to Capital One, the Government does not request the imposition of an additional fine.

of the Auto Masters entities and at least 51% of the remaining entities, each of which had minority owners who were the Defendant's family and/or friends. Ron Janbakhsh, the Defendant's brother, was the 49% minority owner of three dealerships and one related finance company. Co-defendant Steve Piper was the CFO of Auto Masters. And Christian Quiroz was the loan portfolio and collections manager of Auto Masters.

Between 2013 and 2017, Auto Masters had a line of credit with Capital One and First Tennessee Bank (now First Horizon Bank). To secure the line of credit, Auto Masters pledged its loan portfolio as collateral. Under the terms of the line of credit, Auto Masters was permitted to borrow an amount up to 65% of the value of the eligible collateral in its loan portfolio. There were rules about which loans Auto Masters could include as eligible collateral—for example, Auto Masters could not include delinquent loans (more than 60 days past due), or loans in bankruptcy/litigation. Capital One required Auto Masters to regularly certify the total value of its eligible loan portfolio in a "borrowing base certificate" (BBC). Piper typically sent a BBC to Capital One on a monthly basis, and Capital One relied upon the BBC to fund Auto Masters' draws on the line of credit.

### The Fraud Scheme

From at least 2013 until October 2017,[4] the Defendant conspired with Piper, Ron Janbakhsh, and Quiroz to submit false BBCs to Capital One—by inflating their collateral—so that Auto Masters could take draws on the line of credit that they were not entitled to take. The reason for committing this fraud scheme was simple: the Defendant wanted access to additional money

---

[4] Quiroz testified that the falsification of loan data actually began earlier. He said the Defendant and Piper recruited him in 2010 or 2011, at a time when Auto Masters was using "Wayne Reaves," which was the predecessor system to AMS. *See* Transcript of Christian Quiroz Testimony, D.E. 445, PageID #: 76410-13. Piper showed him how to use Wayne Reaves. *Id.,* PageID #: 76420-21. Once the company switched to the AMS database, Quiroz "kind of just figured out on [his] own" how to continue posting false payments in the new system. *Id.,* PageID #: 76416.

to pay for his lifestyle and his other business ventures (as did his brother, Ron Janbakhsh). The Defendant lived a lavish lifestyle—he and his wife drove luxury cars (including a Bentley and Ferrari) and his family took expensive vacations, including to places like Dubai. *See* Transcript of Steve Piper Testimony, D.E. 442, PageID #: 75846-47. But the biggest driver was the Defendant's need for money to support his other businesses and, in particular, the construction of Plaza Mariachi. *E.g., id.*, PageID #: 75752-54; Transcript of Christian Quiroz Testimony, D.E. 445, PageID #: 76480-81.

To avoid Capital One discovering that they were falsely inflating their collateral, members of the conspiracy falsified loan data in the AMS database and took steps to ensure that they "papered the file" so auditors and field examiners would not detect any irregularities. For the Defendant's dealerships, Quiroz was responsible for posting fake payments into the AMS database. The Defendant, as CEO, was not personally entering the fraudulent payments and falsifying account records. But the Defendant knew and helped orchestrate the entry of fake transactions. *See, e.g.,* Transcript of Christian Quiroz Testimony, D.E. 445, PageID #: 76428-30 (the Defendant told Quiroz to teach Ron Janbakhsh how to "properly" post fraudulent payments and hide them so that Ron would not get them all caught). The Defendant also knew that fake documents were being created—he even signed some of them. *Id.*, PageID #: 76487-89. All of this was to conceal that Auto Masters did not actually have the loan portfolio value they were reporting.

Despite the fact that the Defendant repeatedly warned his co-conspirators not to talk about the fraud in writing, the Government presented emails at trial to show that Quiroz and Piper sought the Defendant's advice and approval for carrying out the fraud scheme. *See, e.g.,* Transcript of Christian Quiroz Testimony, D.E. 445, PageID #: 76517-18 (Quiroz would send emails to get direction on steps he was taking to keep the fraud concealed, and wanted Piper "to discuss it with

5

Mark" to make sure everything would be "acceptable"), 76533-36 (discussing email to get the Defendant's "approval" to create new fake loans by using information from loan applicants who had been turned down); Transcript of Steve Piper Testimony, D.E. 442, PageID #: 75753-54 (explaining that the Defendant would tell Piper when he needed money, and it was the Defendant's idea to make the loan portfolio appear to have more "eligible" loans), PageID #: 75762-63 (the Defendant told them not to email about the fraud), PageID #: 75801 (describing the Defendant as a "micromanager" who had to give approval); *see also* Gov't Trial Exhibits 122, 124, 125 (examples of seeking guidance from the Defendant).

Over time, the Auto Masters line of credit was extended and increased, and the maximum principal balance of the line of credit eventually grew to $63 million. Of course, in order for the company to borrow that full amount, Auto Masters would need to certify that it had at least $96.9 in eligible collateral (because it could only borrow 65% of the collateral's value). The Defendant's need for more and more money led the fraud to grow so large that Quiroz and others had to falsify thousands of loan account records every month in order to continue propping up Auto Masters' fraudulently inflated loan portfolio. As the fraud continued to expand, Quiroz and Piper tried to convince the Defendant to stop—but the Defendant told them that he needed to finish building Plaza Mariachi, and then they could work on starting to pay the money back. *See, e.g.,* Transcript of Christian Quiroz Testimony, D.E. 445, PageID #: 76481-82; Transcript of Steve Piper Testimony, D.E. 442, PageID #: 75759-61.

### *Concealing the Fraud from Capital One*

The scheme ran into trouble in early 2017, when the Defendant learned that Capital One was not going to continue to renew the line of credit. The Defendant and Steve Piper attempted to sell off the loan portfolio—at least, the legitimate portion of it—so that they could pay off the

6

Capital One line of credit. But because the fraud had grown to such a large percentage—roughly a third of the portfolio's value—the Defendant and Piper could not find a buyer who would pay them enough for the legitimate loan portfolio. So instead, the Defendant developed a different plan that he hoped would salvage the company and avoid the discovery of the fraud.

In the summer of 2017, the Defendant told Ron Janbakhsh to delete his fraudulent loans from the AMS database; Piper also told Quiroz to remove all of the fraudulent loans at the Defendant's dealerships from AMS. Once the evidence of the fraud was deleted, the Defendant's plan was to (partly) come clean with Capital One and try to work something out. Transcript of Ron Janbakhsh Testimony, D.E. 428, PageID #: 75079-81.

On October 9, 2017, Piper sent an updated BBC to Capital One—without any accompanying explanation—in which Auto Masters admitted to overstating its borrowing base by $33.1 million dollars. Auto Masters admitted in the BBC that it was overdrawn on its line of credit by approximately $26.4 million dollars. Nearly all of the overdrawn funds were due to the fraudulently included loans that had falsely inflated the loan portfolio's reported value.

Despite acknowledging the overstatement, the Defendant was not willing to admit his (or anyone's) involvement in the fraud. Instead, he stalled Capital One's attempted investigation in October 2017 by offering only vague and misleading reasons for the overstatement. When Capital One filed a lawsuit and sought the appointment of a receiver to take control of the company, the Defendant plunged Auto Masters into Chapter 11 bankruptcy on October 17, 2017, which initiated a stay of the receivership litigation. The Defendant thought he could use the bankruptcy to keep control of Auto Masters, work out a payment plan, and potentially get to pay back Capital One a discounted amount. *See* Transcript of Steve Piper Testimony, D.E. 442, PageID #: 75823-24.

7

*The Defendant Works to Obstruct Any Investigation*

The Defendant was part of this fraud scheme from the beginning and well knew who had been involved in the fraud conspiracy. As a result, when the receivership action and bankruptcy case generated additional scrutiny on him and his companies, the Defendant sought to destroy the remaining evidence and tasked others with helping him do so. Indeed, at trial, the Court heard audio recordings in which the Defendant sought advice from his former IT employee on how to destroy evidence so that neither Capital One nor future criminal investigators could find it.[5]

The Defendant conspired with Chad May and Quiroz on October 30, 2017, to delete evidence in order to protect himself, Quiroz, and Piper. Specifically, the Defendant instructed them to delete any emails discussing the fraud and to destroy computer evidence that would show Quiroz's role in the fraud. On November 8, 2017, the Defendant advised Ron Janbakhsh that he too should call Chad May to get help deleting any incriminating evidence against him (Ron). At the time the Defendant took these steps, he knew that a criminal investigation loomed on the horizon. He had told Chad May that "there's no criminal investigation right now," and that no one had "gotten any evidence yet. So we're just trying to prevent them from getting it." *See* Gov't Trial Exhibit 325, p. 6.

On or around November 8, 2017, Auto Masters' newly appointed CRO Steve Curnutte uncovered how the fraud had been committed. Curnutte was also able to connect Quiroz and Ron Janbakhsh's usernames to the falsified AMS data. This forced the Defendant to change course— all to maintain the fiction that he had not been involved in the fraud. The Defendant told Quiroz that he (Quiroz) would have to take the blame. But when Quiroz said that he was not going to lie

---

[5] The Defendant chose to contact Chad May because he knew both that May would help him, and that his then-current head of IT, Benny Butler, would be subjected to questioning and a deposition in connection with the bankruptcy.

under oath, the Defendant gave Quiroz money and encouraged him to leave town. Quiroz did so, leaving Tennessee with his family for approximately a year, before returning in November 2018.

That same day, November 8, 2017, the Defendant also met multiple times with his brother, Ron Janbakhsh, first at his Plaza Mariachi office and late that evening at the Defendant's home. In recorded conversations from the afternoon and evening of November 8th, the Defendant told Ron Janbakhsh to destroy evidence, *e.g.,* Gov't Trial Exhibit 445, p. 1 ("[J]ust say hey man, Will to be safe, go ahead and get rid of that computer"); Gov't Trial Exhibit 459, p. 9 (telling Ron to get rid of his laptop too), and coached Ron on what to say when questioned by anyone investigating the fraud, *e.g.,* Gov't Trial Exhibit 455, p. 6 ("You gotta have good answers for all those questions, and I just gave 'em to you."). The Defendant shared details of Curnutte's investigation with his brother, but warned Ron Janbakhsh not to use phrases like "post payments," because Ron wasn't supposed to "know that yet"; the Defendant reminded Ron that he needed to "act surprised" when confronted by Curnutte's team. Gov't Trial Exhibit 455, p. 5, 6, 8.

### *"I'm never gonna admit anything"*

The Defendant repeatedly rejected Ron Janbakhsh's suggestions when his brother suggested ideas for how they should handle with the investigation. The Defendant was adamant that Ron not put blame on Quiroz—because the Defendant knew that if Quiroz got cornered, the whole fraud and the Defendant's involvement would be revealed.

On the evening of November 8th, the Defendant continued to give advice and told his brother not to admit anything under oath. As for himself, the Defendant explained that "I'm never gonna admit anything . . . [y]ou can put me in jail I'm not gonna admit nothing" because "[y]ou're gonna go to jail either way if you admit it," so "[y]ou gotta go with the chance of not getting fucked." Gov't Trial Exhibit 459, p. 5-6. The Defendant reiterated that his brother should not try

9

to pin the blame on Christian, warning Ron that it would take "[e]verybody down." *Id.*, p. 6-7. The Defendant said "we're all screwed" if Capital One found out that the Defendant and Piper knew about the fraud all along. *Id.*, p. 7.[6]

The Defendant told his brother that they had to keep fighting—insisting that "[w]e can still win"; the Defendant told Ron that their "victory" would be "an amazing plan to pay these guys off and we just got rid of 30 million dollars in garbage that we don't have to feel bad" about. *Id.*, p. 12. Near the end of their conversation, Ron again tried to suggest that they convert the Auto Masters bankruptcy to Chapter 7 (i.e., a liquidation proceeding) and give the car lots to Capital One so that they wouldn't be charged criminally. But the Defendant had already gamed out the different scenarios and decided that it would not make everything go away, so he told Ron to "leave that alone" and stick to the Defendant's plan, because "I just gave you the best deal." *Id.*, p. 15-16.

Two days later, on November 10, 2017, the Defendant informed his brother that he had "fired" Christian. *See* Gov't Trial Exhibit 465, p. 3-4. The Defendant had no other choice—Quiroz had said he was not going to lie and Curnutte's team was pushing to speak with Quiroz. The Defendant then continued to practice the talking points he had come up with, reminding Ron Janbakhsh that "you don't know right now if it's intentional or not," and coaching him with lines such as "what you['re] gonna say is, I didn't have any intent to do anything." *Id.*, p. 5. The Defendant, having been careful not to put things in writing and having destroyed the emails that

---

[6] After the fraud came to light, Ron Janbakhsh complained to the Defendant that he (Ron) did not realize how much fraud the Defendant had been committing. The Defendant admitted to his brother in a recorded conversation that "how it all started" was that "they had equity everywhere else" to cover their fraudulent loans, but that as the fraud grew over time the Defendant lost track of "how bad it was." *See* Gov't Trial Exhibit 465, p. 11. Ron Janbakhsh blamed their CFO, Steve Piper, for not stepping in and warning them about how large the fraud had grown, or telling them it was time to stop, or advising them to develop an "exit strategy" before they dug such a deep a hole. *Id.*, p. 11-12, 18-19.

did exist, thought he was in the clear. He told Ron "there is nothing pointing to me and Steve [Piper]," so "I won't have to say anything." *Id.*, p. 6. Ron Janbakhsh began to spiral about the prospect of being questioned under oath and his concern that everything was going to eventually "come out"; the Defendant reassured him that "We got all the money. We got money to pay ['] em back" and "[w]e have assets." *Id.*, p. 8-9. Ron pointed out that "we're caught red-handed," but the Defendant was unmoved—he said "[y]eah, but I'm not, I'm not gonna talk." *Id.*, p. 9.

In that same conversation, the Defendant told Ron that he could "plead the fifth" but "it's going to look bad" and the Defendant would then have to fire him, *see id.*, p. 11, because that would be necessary to continue the charade that the Defendant was not involved.

### *"Oh, I'm gonna lie"*

In contrast to his brother, the Defendant had already resolved to lie under oath in the bankruptcy proceeding—saying he could not plead the Fifth and that he was "either gonna save the ship or I'm a go down with it." *Id.* When Ron Janbakhsh warned the Defendant not to lie under oath, the Defendant demurred, saying "Oh, I'm gonna lie," because [t]hey don't got no evidence" and "nobody's recorded me." *Id.*, p. 14. The Defendant insisted "nobody has anything on me. I got no recording, I got no evidence . . . it would be worst case scenario, if [Christian and Steve] turn on me, they, they're just trying to save their ass. They got no evidence." *Id.*, p. 16.

On November 13, 2017, the Defendant fired his brother, presumably as part of his effort to remain in control of Auto Masters as the evidence of widespread fraud mounted.[7] That same week, Steve Piper and the Defendant were deposed in the bankruptcy proceeding. And, just as the Defendant had promised, he committed perjury—repeatedly lying under oath about topics such as: his knowledge of and role in the fraud scheme; his knowledge of and role in the efforts to

---

[7] Ron Janbakhsh eventually gave a deposition, a month later, on December 13, 2017, and invoked his Fifth Amendment right against self-incrimination.

conceal/destroy evidence; and his communications with Christian Quiroz. *See, e.g.,* Gov't Trial Exhibit 827, p. 88-89, 103-04. The Defendant falsely claimed he "immediately" terminated Quiroz after learning about the "data manipulation," *id.*, p. 104, and he pretended not to know "whether it was intentional or non-intentional." *Id.*, p. 100. The following week, on November 21, 2017, the Defendant testified in a bankruptcy hearing and again falsely claimed he did not know if the loan portfolio was intentionally manipulated. Gov't Trial Exhibit 797, p. 31-32, 40.

Despite the Defendant's efforts to obstruct the investigation and the bankruptcy proceeding, CRO Steve Curnutte's discovery of the fraud eventually led to the Defendant losing control of his companies and the appointment of a receiver (MCA) to run Auto Masters. Portions of the business were sold off and Auto Masters was ultimately dissolved. The Defendant, Piper, and numerous co-owners (including owners who knew nothing about the fraud) all entered into civil settlements to pay back some of Capital One's losses.

In late 2021 and early 2022, the Defendant learned that federal agents were attempting to speak with co-conspirators, including Christian Quiroz. The Defendant met with Quiroz twice, first on April 9, 2022, and then again on April 14, 2022. At these meetings, the Defendant tried to feel Quiroz out to make sure he was still "loyal" and willing "to follow his lead." *See* Transcript of Christian Quiroz Testimony, D.E. 445, PageID #: 76633-34. At their first meeting, the Defendant told Quiroz not to speak to investigators or do anything; the Defendant said he would look into getting names of an attorney for Quiroz. Quiroz testified that when they met again on April 14, 2022, the Defendant gave him $10,000 in cash. Quiroz said the Defendant did not say what the money was for, and that at this meeting the Defendant repeatedly encouraged Quiroz to leave the jurisdiction again and offered him money if he would do so. *E.g., id.*, PageID #: 76616-21, 76642.

12

During trial in August 2025, the Defendant testified in his own defense and continued to deny his role in the fraud scheme. The Defendant's insistence that he had only learned about the fraud sometime in the summer of 2017 was directly contradicted by every other member of the conspiracy, as well as by emails introduced as evidence and by the Defendant's own recorded statements that were entered as evidence. The jury correctly rejected the Defendant's self-serving testimony and found him guilty on fifteen counts.

   2. History and Characteristics of Defendant

The Defendant has a long work history, which includes the Defendant's ownership and operation of a variety of different business interests, to include car dealerships, radio stations, and Plaza Mariachi. *See* Defendant's Trial Exhibit 22. The Defendant has no prior criminal charges or convictions. However, the Government submits that the Defendant's leadership of this large-scale fraud scheme and his deliberate and repeated obstructive conduct—in 2017, 2022, and 2025—all reflect a serious lack of respect for the law.

As for his finances, it is not clear that the Defendant's financial information section of the PSR actually provides a complete picture of his financial condition and ability to pay. For example, the Defendant claims to have only $5,000 in "personal effects" and $6,000 in cash equivalents, both of which seem low given his historical income and lifestyle, which currently includes renting a multi-million dollar home with 5 bedrooms and a 5-car garage. As another example, the Defendant reports monthly expenses of $2,600 for car loan payments and an additional $1,200 for car insurance, but he does not identify any vehicles under his assets. PSR ¶ 94.

Despite issues such as these, even the limited information that has been provided in paragraph 94 confirms that the Defendant continues to have significant personal assets. The Defendant's financial status is particularly noteworthy when compared to the fallout from Auto

13

Case 3:22-cr-00340     Document 452     Filed 01/15/26     Page 13 of 18 PageID #: 76954

Masters and the bankruptcy proceedings.

It has been over eight years since the Defendant admitted that his companies had misled Capital One and improperly obtained over $24 million. Through the receivership action, Capital One recouped a portion of its losses. In 2019, Capital One obtained a judgment against the Defendant (personally) for $22.17 million, though the bank later entered into a settlement with the Defendant in which he agreed to repay $10.25 million. As of today, the Defendant still owes millions and Capital One is still owed a total of more than $11 million dollars as the result of his fraud scheme.

3. Seriousness of the Offense and Deterrence

Section Two of 18 U.S.C. § 3553(a) deals with the requirements of any sentence to be imposed and lists a variety of factors for a court to consider in determining a sentence. Those include the following:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a)(2).

These factors weigh in favor of the Government's requested sentence for Janbakhsh. The offenses are serious. The Defendant and others engaged in a sustained effort to defraud Capital One. Through the scheme, the Defendant fraudulently obtained more than $24 million dollars from Capital One—much of which still has not been recovered.

The need to deter Janbakhsh specifically, and others generally, from engaging in this type of criminal conduct is real. General deterrence is a particularly important consideration in this type of case. *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (finding that a sentence

14

Case 3:22-cr-00340    Document 452    Filed 01/15/26    Page 14 of 18 PageID #: 76955

for white-collar crime must reflect the need for general deterrence because these crimes are "especially susceptible to general deterrence"); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV., 721, 724 (2005))). The Government's recommended sentence will send a message to those who deceive and defraud victims that these types of crimes are serious and come with real consequences.[8]

A just punishment that sends a message of general deterrence in this case means a lengthy period of incarceration for the Defendant. The Government's sentencing recommendation is consistent with the sentences imposed on other defendants in this District who have engaged in large-scale fraud. *See United States v. Jerkins*, Case No. 3:25-cr-00005 (M.D. Tenn. 2025) (Trauger, J.) (108-month sentence for $4.5 million tax fraud scheme); *United States v. Orusa*, Case No. 3:18-cr-00342 (M.D. Tenn. 2023) (Crenshaw, J.) (84-month sentence for $1.8 million healthcare fraud scheme); *United States v. Young*, Case No. 3:20-cr-00169 (M.D. Tenn. 2021) (Campbell, J.) (96-month sentence for Ponzi scheme with approx. $700,000 in losses); *United States v. Warren*, Case No. 3:18-cr-00153 (M.D. Tenn. 2019) (Richardson, J.) (108-month sentence for $28 million fraud scheme); *United States v. George*, Case No. 3:15-cr-00069 (M.D. Tenn. 2019) (Wilson, J.) (240-month sentence for $2.25 million fraud where defendant ignored cease and desist order and had prior convictions); *United States v. Posey*, Case No. 3:13-cr-119 (M.D. Tenn. 2019) (Trauger, J.) (168-month sentence for $6.5 million fraud); *United States v.*

---

[8] That a defendant must repay the money they fraudulently obtained does not particularly aid general deterrence. For one thing, this obligation only arises if the defendant is caught and held accountable. For another, returning ill-gotten proceeds merely restores the money to its rightful owner, and so is not a substitute for imposing a significant custodial sentence.

*Garton*, Case No. 3:18-cr-332 (M.D. Tenn. 2019) (Richardson, J.) (92-month sentence for $1.36 million fraud scheme); *United States v. Brian Whitfield*, Case No. 3:12-cr-00044 (M.D. Tenn. 2015) (Campbell, Todd, J.) (240-month sentence for $25 million fraud). A review of Judiciary Sentencing Information (JSIN) from the Sentencing Commission shows that, over the past five years, white collar fraud defendants with the same advisory guideline range as the Defendant have received an average sentence of 145 months, with a median sentence of 120 months.[9] The Government recognizes that its 180-month recommendation, while below the advisory guideline range, exceeds the average and median sentence lengths for similarly situated defendants. That is because, beyond the size of the fraud scheme itself, there are aggravating circumstances that warrants a longer custodial sentence. Most notably, to promote respect for the law.

    In this case, it is particularly important to send a message of deterrence to the Defendant (and others) regarding the Defendant's brazen efforts to obstruct justice. The Defendant repeatedly has displayed a complete lack of respect for the law by destroying evidence, encouraging witnesses to lie (and/or flee), and giving false testimony himself. The Defendant's acts of obstruction were not a fleeting moment of poor judgment, but were a deliberate, premeditated, and sustained effort to avoid ever being held accountable (civilly or criminally) for his actions. And not only did the Defendant lie in 2017 during bankruptcy proceedings, the Defendant again testified falsely in his own defense at his criminal trial in 2025. The Government submits that the audio recordings entered into evidence show that the Defendant's testimony was not truthful. Those same recordings also lay bare the Defendant's unremorseful attitude about lying under oath. The Court should

---

[9] *See* United States Sentencing Commission, Judiciary Sentencing Information, *available at* <https://jsin.ussc.gov/analytics/saw.dll?Dashboard> (based on defendants sentenced under USSG § 2B1.1, with a total offense level of 39 and a criminal history category of I).

impose a lengthy sentence of imprisonment to send a clear message that repeated attempts to obstruct justice will lead a defendant to face serious consequences.

    4. The Need to Avoid Unwarranted Sentence Disparity

The United States' requested sentence appropriately accounts for the defendant's offense conduct and will adequately reflect the need for punishment and deterrence. Although the United States' requested sentence is below the advisory guideline range, the Government submits that it is appropriate for all the reasons discussed herein.

## CONCLUSION

The Defendant's crimes were serious financial crimes that resulted in defrauding a financial institution of over $24 million. The extensive fraud—and the Defendant's role as the leader and main beneficiary of the scheme—standing alone are enough to warrant a lengthy sentence of incarceration. But there is a special need to address the Defendant's repeated and shameful efforts to obstruct the investigations of the fraud.

For all of the reasons set forth above, and in order to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, and due to the nature and characteristics of the defendant, and the need to protect the public from future harm by the defendant, the United States respectfully requests the Court impose a sentence of 180 months, with a 3-year term of supervised release to follow. The United States further requests the Court order forfeiture as set forth in the United States' forfeiture motion, order $11,272,521.20 in restitution, and order the Defendant to pay the mandatory $1,500 special assessment.

    Respectfully submitted,

    BRADEN H. BOUCEK
    United States Attorney

By:    /s/ Chris Suedekum
       CHRIS SUEDEKUM
       Assistant U.S. Attorney
       719 Church Street, Suite 3300
       Nashville, Tennessee 37203
       Phone: (615) 736-5151
       chris.suedekum@usdoj.gov