UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA

v.

Case No. 3:22-cr-00340

MAHAN JANBAKHSH                      JUDGE CRENSHAW
     a/k/a MARK JANBAKHSH
STEVEN PIPER

**Defendant Mark Janbakhsh's Position on PSR**

# TABLE OF CONTENTS

I. OVERVIEW ....................................................................................................1

    A.    The PSR makes fundamental errors that affect nearly every aspect of the report and skew the Guidelines' calculation. .............................1

    B.    The correct advisory guideline range is 87–108 months. .................2

II. SPECIFIC OBJECTIONS ...........................................................................3

    A.    Many "facts" in the PSR are unsupported, and the PSR does not attempt to resolve the valid objections. ................................................3

    B.    The restitution calculation is wrong and must be reduced. ..............4

    C.    The "loss amount" is unsupported and inconsistent.........................8

    D.    The sophisticated means enhancement does not apply....................9

    E.    The enhancement for deriving >$1 million does not apply. ...........11

    F.    The leader/organizer enhancement does not apply. .......................14

    G.    The zero-point offender reduction applies once the disqualifying leader/organizer enhancement is removed......................................18

    H.    The forfeiture section is unsupported and does not apply..............18

Under L.Cr.R. 32.01(c)(4), Defendant Mark Janbakhsh objects and responds to the revised presentence report (PSR) and addendum, dated December 22, 2025, as follows:[1]

# I. OVERVIEW

## A. The PSR makes fundamental errors that affect nearly every aspect of the report and skew the Guidelines' calculation.

The PSR makes at least two fundamental errors that affect the entire report. First and most broadly, the PSR wrongly accepts every relevant allegation in the indictment or alluded to at trial as if it were established fact. In doing so, it disregards all contradictory testimony and other evidence—of which there is much—and effectively relieves the government of its burden at sentencing. Simply put, the jury's verdict on liability does not establish the facts on which most the PSR's guideline conclusions are based.

Second, the PSR wrongly conflates Mark Janbakhsh's role at Auto Masters with his role in the overall conspiracy. This error most directly affects the "leader/organizer" enhancement under U.S.S.G. §3B1.1 (discussed in Part II.F *infra*) but also permeates the entire report. As the evidence at trial made clear, whatever else these crimes may have been, they were not well organized, much less centrally "led" by Mark Janbakhsh. His role as CEO of Auto Masters is irrelevant to that analysis and should be disregarded for purposes of assessing his role in the offenses.

---

[1] Defendant is contemporaneously filing a comprehensive sentencing memorandum that addresses many of similar issues in the context of the 18 U.S.C. § 3553(a) factors. This Position incorporates the arguments in that memorandum to the extent they relate to any issue herein.

1

**B.      The correct advisory guideline range is 87–108 months.**

The correct guideline range in this case is 87–108 months. Parts II.C-G further describe the enhancements the PSR wrongly applies and why they are legally inapplicable here. If the Court rejects the three enhancements addressed below—aggravating role (§ 3B1.1), gross receipts (§ 2B1.1(b)(17)(A)), and sophisticated means (§2B1.1(b)(10)(C))—the offense level calculation is: Base 7 (§2B1.1(a)(1)), 20 points for the loss band (§2B1.1(b)(1)(K)), 2 points for the bankruptcy-proceeding misrepresentation (§2B1.1(b)(9)(B)), for an offense level of 29. That is exactly the "defense calculation" reflected in the PSR Addendum's Supplemental Information table, which yields an advisory range of 87–108 months. *See* PSR Addendum at 7. The below table sets out the calculations with the disputed enhancements in yellow:

| Guideline (U.S.S.G. §) | PSR (¶) | Correct calculation |
|---|---|---|
| Base (§ 2B1.1) | 7 (¶53) | 7 |
| Loss (§ 2B1.1(b)(1)(K)) | 20 (¶54) | 20 |
| Bankruptcy misrepresentation (§2B1.1(b)(9)(B)) | 2 (¶55) | 2 |
| Sophisticated means (§2B1.1(b)(10)(C)) | 2 (¶56) | 0 |
| Personally derived >$ 1 million (§2B1.1(17)(A)) | 2 (¶57) | 0 |
| Organizer/leader (§3B1.1(a)) | 4 (¶59) | 0 |
| Obstruction of justice (§3C1.1) | 2 (¶60) | 2 |
| Zero point offender (§4C1.1) | NA | -2 |
| **Total** | **39** | **29** |
| **Resulting U.S.S.G. range in months** | **262–327** | **87–108** |

## II. SPECIFIC OBJECTIONS

### A. Many "facts" in the PSR are unsupported, and the PSR does not attempt to resolve the valid objections.

Defendant Janbakhsh objected to several factual contentions in the PSR. In many if not all cases, the resolution of those facts does not affect the sentencing guidelines. But they remain unresolved, and the PSR does not even attempt to resolve them. Rather, the PSR provides a blanket response to those factual objections that "[t]he information in the aforementioned paragraphs was taken directly *from the Indictment* and obtained from various defendants or coconspirators who testified at trial and/or from statements to the Government/agents." PSR Addendum at 3 (italics added). Of course, relying solely on the allegations "from the Indictment" is insufficient. But more broadly, the PSR provides no citation of any kind to substantiate its statement. That leaves the Defendant unable to assess, for example, what testimony, from whom, what statements, when, or any other details. By contrast, Defendant's objections cited specific testimony or other evidence to support its objection or noted where the trial testimony did *not* support PSR's conclusion. Nothing in the PSR rebuts those objections. Instead, the PSR punts the issue to the Court: "As the Court heard relevant testimony at trial, it is in the best position to determine the reliability of all trial testimony." *Id.*

Mr. Janbakhsh does not wish to extend a hearing over factual matters that may not have any bearing on the Court's findings and ultimate sentence. But for completeness and accuracy, he maintains the objections to Paragraphs 11, 14, 17, 18, 20, 21, 26–32, 34, 36–39, 46, and 55. These specific objections and, where applicable,

3

supporting citations to the record are summarized in counsel's letter to the probation office detailing its initial objections to the original PSR. *See* 12/15/25 J.Glover Ltr. at 1–5 (attached as **Exhibit 1**).

## B. The restitution calculation is wrong and must be reduced.

Paragraph 47 states that the restitution owed is $16,022,521.20. On January 14, 2025, the probation office filed a supplement that correctly describes an additional payment of $4.75 million that Defendant Janbakhsh has paid as the result of selling Plaza Mariachi. The supplement calculates the new restitution figure as $11,272,521.20 (calculated by subtracting $4,750,000 from the original $16,022,521.20).

The revised figure, however, still overstates the proper restitution figure because the originally calculated figure of $16,022,521 is wrong. That original calculation relies entirely on a letter submitted by counsel for Capital One. *See* App'x A to PSR (12/17/25 Letter from counsel for Capital One) ("Quarles Letter"). The restitution is overstated in several ways.

First, the Quarles Letter starts its analysis from the "Balance of Capital One Claim," which it tabulates as $64,082,721.79. But the correct starting point is the total outstanding principal amount of the Capital One loan, which Capital One has previously agreed—and a federal bankruptcy court has ordered—was $62,994,791.73. *See* 8/21/19 Proposed order approving settlement at 3 (¶E), D.E. No. 812, Case No. 3:17-bk-07036. (**Exhibit 2**). The resulting difference is $1,087,930.60.

That difference represents accrued interest that is not properly considered restitution in this case. While the Mandatory Victims Restitution Act is silent as to

4

interest, the Sixth Circuit has found that awarding interest is in the district court's discretion. *See* 18 U.S.C. § 3664; *United States v. Fike*, 140 F. 4th 351, 354–56 (6th Cir. 2025). Other courts have regularly recognized that interest is *not* appropriate and have declined to award it as restitution. *United States v. Ward*, 2015 WL 13863507 (N.D. Ill. 2015); *United States v. Willis*, 2018 WL 5314920 (D.N.M. 2018).

Here, interest is inappropriate, and the government has not met its burden to show it is justified. It appears that Capital One claims the interest rate from the underlying line-of-credit agreement should apply, but there is no explanation as to how it was calculated or any further support. More fundamentally, the theoretical purpose of interest is to reflect the change in value from "the date of the loss and the date of sentencing." *Fike*, 140 F. 4th at 356. But applying interest to the entire debt amount, based on a rate from a nearly decade-old agreement, does not do that. Among other things, millions of dollars of payments have been made since that time, which are not reflected in the interest calculation. It also fails to recognize the bankruptcy settlement agreement—which did not provide for interest—and that the subsequent payments (approximately $10 million) have not included any interest. To add nearly $1.1 million in interest represents not restitution but an unfair windfall, and the Court should decline to impose it.

Second, the restitution must be discounted further to reflect Capital One's commercial choices—independent of any conduct by any defendant—that artificially increase the restitution. Specifically, it is undisputed that the assets sold off in the bankruptcy and receivership process were not sold at full value. While the portfolio

5

was approximately $60 million in value, *see* MCA Report at p. 23 (**Exhibit 3**), Capital One elected to sell the portfolio at a deeply discounted price, approximately 73% of the actual value, *see id*. at p. 13; *see also* Trial Transcript, Day 2 at pp. 53, 70–71 (Capital One witness Bridget Rainero stating that the portfolio was sold for approximately $31.5 million). Capital One also decided to sell the inventory associated with the Auto Master's dealerships at a discount. *See id.* Those were its business decisions to make. But for restitution purposes in a criminal case, it results in a significant overstatement of what the restitution should have been had Capital One taken a longer or more conservative approach to asset sale. In other words, a victim cannot fire-sale assets of the defendant and then recoup the consequence of that decision by claiming restitution for the difference. As noted in *Fike*, a victim's position can change between the loss and sentencing. But that works both ways. Here, Capital One received an offset to its losses (the Auto Masters assets) that had a *value of X*. But then Capital One made the independent decision to liquidate those assets (that is, to convert the offset) at a *fraction of X*. It should not now be able to recoup via the criminal restitution process the consequences of that decision, which have nothing to do with the "loss" or any defendant's conduct.

The proposed restitution is artificially increased in indirect ways beyond just the discounted sale of the portfolio and inventory. For example, during trial, it was established that Capital One paid MCA $1,997,826.54 for fees and reimbursement of costs. *See* Trial Transcript, Day 5 at p. 82. The money Capital One paid toward those grossly excessive fees is money that was not used to pay down the debt owed. Again,

6

that is Capital One's business choice, but the criminal restitution process is not a vehicle to recoup those costs.

Ultimately, it remains the government's burden to establish the restitution figure, but the 27% reduction in value of just the portfolio assets represents over $16 million ($60 million x 0.27 = $16,200,000). Even assuming that reasonable fees and transaction costs were _half_ that figure, the sale of assets undervalued the offset Capital One received by over to $8 million. And that is without adding _any_ discount on the inventory. Applying a similar principle to the excessive MCA fees, even assuming that MCA was justified in billing half that amount—nearly $1 million—another million must be credited against the amount owed and, ultimately, the restitution. Accordingly, by even the most conservative estimate, the restitution figure should be further reduced by $9 million or a similar amount.

Third, the various fees included in the restitution figure are inappropriate or excessively high. Again, it is unclear the nature of all those fees, but the attorney fees alone, _see_ Exhibit E to Quarles Letter, are nearly $200,000. Notably, these alleged fees are purportedly for "Auto Masters Grand Jury Subpoena Response." _See id._ But responding to a grand-jury subpoena is _not_ related to being a "victim" at all. Such subpoenas are investigative tools issued to parties of all types, and costs associated to responding to them are not within the ambit of § 3663A(4). Moreover, as a "financial institution," Capital One already has received (or could receive) reasonable compensation for responding to a grand jury subpoena. _See_ 12 U.S.C. §3415 (describing required cost reimbursement from the government to financial

7

institutions for "costs as are reasonably necessary and which have been directly incurred in searching for, reproducing, or transporting [various materials] required or requested to be produced.") Finally, further undermining the sheer size of the claim, the records at question were already produced and available in the federal bankruptcy proceeding. The "re-production" of them in the criminal investigation long after would, at most, incur a nominal fee.

In sum, the government has not met its burden that these fees are appropriate and, accordingly, the restitution figure should be further reduced as follows:

| | |
|---|---|
| Total restitution figure in PSR Supplement | $11,272,521.20 |
| Less interest and certain fees | ($1,087,930.60) |
| Less estimated 50% of the discount of sold assets | ($8,000,000.00) |
| Less estimated 50% of excessive MCA fees | ($1,000,000.00) |
| Less excessive or inappropriate attorneys' fees (estimated at 90% of $200,000) | ($180,000.00) |
| **Corrected total** | **$1,004,590.60[2]** |

## C. The "loss amount" is unsupported and inconsistent.

Mr. Janbakhsh objected to Paragraph 54, which calculated the specific offense characteristic related to the amount of loss. As explained to the probation office, Defendant does *not* object to the resulting guideline amount (plus 20 levels) as a mechanical application of the Guidelines, while maintaining that that mechanical

---

[2] This total is a conservative estimate that does not fully consider, among other things, the discount Capital One chose to take on the Auto Masters' inventory by selling the vehicles to a single party rather than getting market or near-market value at a typical auto auction.

application wildly overstates the relative culpability in this case. Rather, the PSR relies on multiple inconsistent figures throughout the PSR—e.g., $26.4 million overdraw, $24.05 million "intended" from MCA, etc.—and there is no attempt to reconcile those figures. Nor is there any record evidence cited to establish a figure, which it remains the government's burden to produce. Defendant objects to the inconsistency and lack of detail supporting this figure, which further supports its arguments made elsewhere that the "loss" greatly exaggerates his culpability generally and is specifically unreliable based on, among other factors, the absence of the AMS database, the reliance solely on derivative documents like the loan tape and unwind report, and the blanket inclusion of loans as "falsified" without any specific analysis to justify that conclusion. *See* Janbakhsh Sent'g Mem. Part III.F.

**D.  The sophisticated means enhancement does not apply.**

The sophisticated-means enhancement under U.S.S.G. *§* 2B1.1(b)(10) does not apply given Mr. Janbakhsh's individual conduct. For the enhancement to apply to a given defendant, the defendant's own conduct—not that of the overall scheme— must be sophisticated or complex. *See* U.S.S.G. *§* 2B1.1(b)(10)(C) (requiring that that [1] the offense "involved sophisticated means *and [2] the defendant intentionally engaged in or caused the conduct constituting sophisticated means*." (emphasis added). The italicized language, added in 2015, clarifies that a court cannot only consider "the sophistication of the overall scheme without determination of whether the defendant's own conduct was 'sophisticated.'" *United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023) (quoting U.S.S.G. Supp. App. C, Amdt. 792 (Reason for Amendment)). The Sixth Circuit explicitly adopted this rationale, stating that the

enhancement "depends on the actions taken by the individual, and a defendant who takes part in a complex conspiracy should not automatically [be] given a sophisticated means enhancement if his or her own personal involvement did not constitute sophisticated means." *United States v. Lanier*, 2024 WL 915158, at *9 (6th Cir. Mar. 4, 2024). (internal quotations omitted).

Here, the enhancement fails because Mr. Janbakhsh did not engage in any sophisticated actions. Sophistication means "especially complex or especially intricate offense conduct." U.S.S.G. § 2B1.1, Application Note 9. Importantly, the Sixth Circuit has emphasized that even when a conspiracy is sophisticated, sentencing enhancements must be based on the individual defendant's personal actions and knowledge. Consider *United States v. Kraig*, 99 F.3d 1361 (6th Cir. 1996). In examining a complex conspiracy, the court held that:

> "the sophisticated means enhancement requires the sentencing court to look at *the actions taken by the individual*. A defendant involved in a complex or repetitive tax conspiracy is not *automatically* given a sophisticated means enhancement if his or her personal involvement did not constitute sophisticated means. [Defendant] did not personally open the Swiss bank accounts or set up the shell corporations—this was the work of the Panamanian law firm. While the evidence demonstrates that [Defendant] undoubtedly knew of their existence and function in the conspiracy, his personal involvement with them was minimal."

*Id*. at 1371 (emphasis added).

The PSR's factual basis for the enhancement rests on the fact that the defendants "made false entries in AMS" and "falsified paperwork." PSR at ¶ 56. Setting aside whether this qualifies as "sophisticated," none of the government's witnesses testified that Mr. Janbakhsh *ever* actually used the AMS database. Indeed, the government's witnesses even testified that they had "no direct proof of Mark making

fraudulent payments or entries." Trial Transcript, Day 2 at p. 210. Steven Piper testified that he never taught anyone, including Mr. Janbakhsh, how to make false entries in AMS. Trial Transcript Day 3, p. 171. He even testified that if anyone said differently in their testimony that it would be a "flat lie." *Id*. With respect to paperwork, it is not clear what specific "paperwork" the PSR is referring to—and it provides no citation or other support—but the evidence at trial does not support Mr. Janbakhsh's personal involvement in falsifying any documents.

Courts have declined to apply this enhancement where a defendant displayed similar, limited participation in a scheme, even if it was sophisticated. *See, e.g.*, *United States v. Hess*, 106 F.4th 1011, 1035 (10th Cir. 2024) (defendant's "generic involvement" with "major aspects" of the scheme did not satisfy the enhancement); *Kraig*, 99 F.3d at 1371 (enhancement inapplicable where defendant "undoubtedly knew" of sophisticated acts but his "personal involvement was minimal"). Accordingly, the enhancement should not apply.

### E. The enhancement for deriving >$1 million does not apply.

At trial, there was no showing that Mr. Janbakhsh personally "derived" over $1 million in gross receipts from Capital One. Under the Guidelines, a two-level enhancement applies if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. §2B1.1(b)(17)(A). Consistent with that text, the Sixth Circuit requires individualized findings tying any amount to the defendant's own conduct and foreseeability. *See United States v. Tucker*, 90 F.3d 1135, 1144–45 (6th Cir. 1996). The evidence does not support tying any fraudulently obtained money to Mark.

11

The PSR applies the enhancement solely because "the defendant caused a loss to Capital One in the amount of $24,049,701.65." PSR ¶57. That is not the legal test. Institutional loss does not establish that Mr. Janbakhsh personally "derived" more than $1 million "from" the bank. Nor do statements about total amounts flowing into entities tied to Mark Janbakhsh. The record does not contain any tracing or quantification of funds paid to him individually from bank proceeds. Indeed, the government did not attempt to do this at trial. The PSR describes that Mr. Piper drew on the line of credit and "distribute[d] the funds amongst the various owners" (¶16) but offers no ledger or amount tied to Mr. Janbakhsh. Salary and later income figures (¶¶93–97) are not shown to be proceeds "from" Capital One rather than ordinary compensation.

The Capital One restitution summary proves repayments and a remaining balance, not personal receipts. The Addendum asserts that "some of the money" went to Plaza Mariachi "and for personal gain." PSR Addendum at 5. But this still identifies no specific *unlawfully obtained* proceeds that went to Mr. Janbakhsh. At trial, the government put on some proof to show only that nearly $2.68 million of funds were moved "out of the Auto Masters bank account into the Plaza Mariachi bank account." Trial Transcript, Day 3 at p. 23. But that is insufficient, as there has been no showing what if any portion of that $2.68 million was fraudulently obtained.

In short, the PSR wrongly conflates entity draws with "individual receipts." But this enhancement does not apply absent evidence that traces funds over $1 million to Mr. Janbakhsh personally, excluding corporate draws or co-conspirator re-

ceipts. "Unlike the loss amount, which holds a defendant accountable for *all* reasonably foreseeable losses, the gross-receipts enhancement applies only if the gross receipts to *the defendant* individually, rather than to all participants, exceeded $1,000,000." *United States v. Constantinescu*, 147 F.4th 299, 315–16 (2d Cir. 2025) (quoting § 2B1.1 app. note 13(A)) (emphasis added).

This distinction makes sense. The Sixth Circuit has stated that, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is *significantly narrower* than the conduct embraced by the law of conspiracy." *United States v. Tucker*, 90 F.3d 1135, 1144 (6th Cir. 1996). Thus, "individualized findings regarding the scope of the conspiracy and the duration and nature of each defendant's participation in the scheme" are needed, and "a preponderance of reliable evidence must establish both scope and foreseeability." *Id.* at 1144–45; *see also United States v. Jones*, 9 F. App'x 386, 393 (6th Cir. 2001) ("[T]he record does not reflect that the district court sufficiently focused on [defendant's] individual involvement to the extent necessary for us to sustain a finding that [defendant] was responsible for the amount wired by [a different defendant], not to mention the full amount wired by the other three codefendants.").

In sum, corporate inflows to Auto Masters or its affiliates are insufficient, as is the general contention that "Capital One suffered an intended loss of $24,049,701.65," which is the sole basis on which the PSR justifies this enhancement. But the Guidelines focus on what the defendant "obtained," even indirectly, and Sixth Circuit precedent forecloses bootstrapping corporate receipts to the individual absent

13

proof that more than $1,000,000 actually accrued to him. *Tucker*, 90 F.3d at 1144–45. Because the government has not identified—let alone proven—more than $1,000,000 in "gross receipts to [Mr. Janbakhsh] individually," the Court should decline to apply §2B1.1(b)(17)(A).

### F.     The leader/organizer enhancement does not apply.

The leader/organizer enhancement under U.S.S.G. § 3B1.1 does not apply either. This adjustment is "a two-part inquiry." *United States v. Tai*, 41 F.3d 1170, 1173 (7th Cir. 1994). First, courts look at "defendant's role in the offense." *Id*. Then, second, courts look at "the nature of the offense itself." *Id*. Both parts of this inquiry weigh against applying this enhancement.

*First*, Mr. Janbakhsh was not a leader or organizer. The PSR improperly equates his corporate title with a leadership role in the offense, asserting he must have been the organizer because he was Auto Masters' CEO and "chief decision maker" with "supervisory authority." PSR ¶ 59. But a job title is not a §3B1.1 substitute. The Guidelines' commentary makes clear that titles are "not controlling" and that leadership turns on proof of recruitment, direction of participants, decision-making over the criminal conduct, a larger share of proceeds, and similar factors tied to the offense itself—not the org chart. *See* U.S.S.G. §3B1.1 cmt. n.4.

The trial record confirms there was no central architect. The conduct was diffuse and inconsistent. Mr. Piper testified that he never knew of the false payment activity until Mr. Janbakhsh and Christian Quiroz approached him. Trial Transcript, Day 3 at pp. 73–74. Then Mr. Quiroz said he knew nothing about posting false payments until Mr. Janbakhsh and Mr. Piper called him into the office one day. Trial

14

Transcript, Day 8 at p. 154. Mr. Quiroz said that Mr. Piper was "the one that showed me how to" post false payments. *Id*. at 153. But Mr. Piper said if anyone testified that he was the one who "trained them on how to do these false payments" that it would be a "flat lie." Trial Transcript, Day 3 at p. 171. And Mr. Quiroz testified that Ron Janbakhsh, before any of the above happened, was *already* posting false payments in the *previous* database used by Auto Masters and that he just "show[ed] him ways to do it where other people will not see." Trial Transcript, Day 8 at p. 215. This circular, contradictory testimony points to a disorganized, decentralized practice—not a scheme directed by Mr. Janbakhsh. The documentary evidence is equally unavailing. As just one example, the lengthy five-year-long text chain introduced at trial shows detailed discussions between Quiroz and Ron Janbakhsh—but never Mark. It is difficult to imagine how one is a "leader" of a scheme yet is absent from a yearslong discussion about that scheme. Nor does the verdict resolve the point: the jury was instructed it could convict on deliberate-ignorance grounds, meaning it did not have to find he led, organized, or even knowingly orchestrated anyone. On this record, the government has not carried its burden to prove a leadership role by a preponderance of the evidence.

*Second*, even if Mr. Janbakhsh acted as an organizer, that still does not automatically mean that this enhancement applies. The language at issue here, whether a criminal activity "involved five or more participants or was otherwise extensive" plainly relates only to "size." *United States v. Wilson*, 240 F.3d 39, 48 (D.C. Cir. 2001) (emphasis added). Here, the government only alleged four participants—Mr.

Janbakhsh, Christian Quiroz, Ron Janbakhsh, and Steve Piper—so it fails the numeric requirement. That leaves "otherwise extensive," which is what the PSR and government explicitly rely on for applying this adjustment. *See* PSR at ¶ 59.

Section 3B1.1(a) Application Note 3 defines "otherwise extensive" by consideration of "all persons involved during the course of the entire offense." "If the offense involved fewer than five participants, the "otherwise extensive" language of § 3B1.1(a) is an alternative ground on which the sentencing court may base its decision to depart upward." *United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002). Both the explicit numeric participants test and "otherwise extensive" tests "are equivalent," meaning that the four-point adjustment is not appropriate under the "otherwise extensive" test "unless the offense in question was somehow the functional equivalent of a crime involving five or more participants." *Id*. at 699–700. (holding that "what the Sentencing Commission had in mind was 'numerosity.'").

Here, the PSR identifies *at most* four criminally responsible participants—Mr. Janbakhsh, Piper, Mehran, and Quiroz—and does not prove a fifth. This should end the inquiry. *Tai*, 41 F.3d at 1173 (an offense involving "three criminal participants and the unknowing services of two outsiders" was not "otherwise extensive"). The record shows that these individuals solely conducted the scheme: the AMS postings, fake payment re-labeling, and borrowing base submissions were executed by the same small, internal group. No other factors to which the government could point here are relevant. The Sixth Circuit has been clear that "width, breadth, scope, com-

16

plexity and duration of the scheme" are "factors that this court has held are not relevant to a § 3B1.1 analysis." *United States v. Bathily*, 392 F. App'x 371, 377 (6th Cir. 2010) (finding that the district court erred by applying the "otherwise extensive" adjustment by looking at factors other than numerosity) (citing *United States v. Anthony*, 280 F.3d 694, 699–700 (6th Cir.2002)).

The stakes of § 3B1.1 are not academic. It is the only thing standing between Mr. Janbakhsh and the Guidelines' "zero-point offender" reduction. Under U.S.S.G. § 4C1.1, a first-time, non-violent defendant with zero criminal history points receives a two-level decrease. Mr. Janbakhsh qualifies: the PSR confirms he has no criminal record—indeed, no prior criminal conduct at all (PSR ¶¶ 65–68)—and the disqualifiers in § 4C1.1 (*e.g.*, sex offenses, violence, terrorism) are nowhere in this case. But if the Court were to apply a leader/organizer enhancement, § 4C1.1(a)(10) would automatically bar the reduction.

That is precisely why the PSR's application of § 3B1.1 is so consequential—and so mistaken.[3] The record does not support a leadership finding. Once that erroneous enhancement is removed, § 4C1.1 applies by its terms, and Mr. Janbakhsh's offense level drops two levels.

---

[3] Even if one of the two contested §2B1.1 enhancements, discussed *supra*, were erroneously retained while the role enhancement is rejected and §4C1.1 still applies, the resulting ranges would be: (a) keep only sophisticated means (+2; Offense Level 29 (87–108 months)); or (b) keep both sophisticated means and gross receipts (+4; Offense Level 31 (108–135 months)). Both ranges are still radically different than the Guidelines' ranges requested by the government. The Court should not adopt either scenario, but these alternatives underscore how dispositive the leadership and zero-point determinations are to the correct advisory range.

17

### G. The zero-point offender reduction applies once the disqualifying leader/organizer enhancement is removed.

Under U.S.S.G. § 4C1.1, a defendant is eligible for a two-level reduction in his offense level if he has zero criminal history points and otherwise meets the criteria in that section. Here, it is undisputed that Mark Janbakhsh has no criminal history or past criminal conduct of any kind (*see* PSR ¶¶ 65–68). Further, most of the disqualifiers in § 4C1.1 involve conduct plainly not at issue here—e.g., sex offenses, threats of violence, terrorism, and the like. But §4C1.1 also does not apply when a defendant receives an adjustment for leader/organizer under U.S.S.G. § 3B1.1. *See* § 4C1.1(a)(10). As noted above, the PSR wrongly applies that enhancement (*see* PSR ¶ 59), and it should be removed for the reasons described in Part II.F. *supra*. Once the leader/organizer enhancement is removed, Janbakhsh is eligible for the zero-point offender adjustment, which reduces his offense level by two levels.

### H. The forfeiture section is unsupported and does not apply.

The PSR recites various information in its forfeiture section. No preliminary order of forfeiture has been issued and no showings by the government have been made to meet the legal burdens associated with forfeiture proceeds. Defendant objects to such references and to forfeiture conclusions generally, which have not been established and to which defendant reserves all rights and arguments.

Respectfully submitted,

<table>
<tr><td>

s/ Ty E. Howard
Ty E. Howard (No. 26132)
thoward@bradley.com
Ocasha Musah (No. 39224)
omusah@bradley.com
Bradley Arant Boult Cummings LLP

</td><td>

s/ John R. Glover
J. Alex Little (TN BPR #29858)
alex@litson.co
John R. Glover (TN BPR #37772)
jr@litson.co
Litson PLLC

</td></tr>
</table>

18

ONE 22 ONE
1221 Broadway, Suite 2400
Nashville, TN  37203
(615) 252-2376

54 Music Square East, Suite 300
Nashville, TN 37201
615-985-8205

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, I caused the electronic filing of the

foregoing document with the Clerk of Court using the CM/ECF system, which will

serve a notice of electronic filing on the following:

Chris Suedekum
Office of the United States Attorney
719 Church Street
Nashville, TN 37203

Jodie Bell
501 Union Street, Suite 525
Nashville, TN 37219

*s/ Ty E. Howard*
Ty E. Howard

19