UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA

v.

Case No. 3:22-cr-00340

MAHAN JANBAKHSH                  JUDGE CRENSHAW
   a/k/a MARK JANBAKHSH
STEVEN PIPER

**Defendant Mark Janbakhsh's Sentencing Memorandum**
**and Motion for Downward Variance**

# TABLE OF CONTENTS

I. INTRODUCTION....................................................................................... 1

II. THE ADVISORY GUIDELINES RANGE............................................... 2

III. THE § 3553(a) FACTORS....................................................................... 3

    A. The nature and circumstances of Mark Janbakhsh's offense warrant leniency (§ 3553(a)(1))............................................................................. 3

        1. Mark has long taken full responsibility for the Auto Master's events even while contesting his criminal liability. ......................................... 3

        2. The events reflect disorganized, decentralized conduct that Mark never led........................................................................................................... 5

        3. Mark did not personally benefit from the ill-gotten funds, and funds indirectly obtained were not used for his personal gain............................ 5

        4. Mark has taken extraordinary steps, even before any criminal investigation, to repay the debts and resolve this matter........................... 6

        5. Mark's admitted poor judgment in the wake of the bankruptcy reflected his desperate attempt to save his company—not to obstruct justice........... 6

    B. Mark's personal history and characteristics are truly exemplary and justify significant weight at sentencing (§ 3553(a)(1))...................................... 7

        1. Mark has a long history of supporting those in need and helping others build their own successes................................................................. 7

        2. Mark's personal and professional dealings reflect his good nature and genuineness—and the aberrant nature of his conduct in this matter. ...... 10

        3. Mark's professional life—long pre-dating this matter—has been dedicated to diversity, Nashville's immigrant community, and serving others. ........ 11

    C. A modest sentence, along with the consequences of a felony conviction, reflect the seriousness of the offense and other factors under § 3553(a)(2)(A). .......... 12

    D. A modest sentence adequately deters crime, and there is no threat to the public (§ 3553(a)(2)(B), (C)). ........................................................................ 13

    E. The proposed sentence is appropriate for a non-violent, first-time offenders like Mark (§ 3553(a)(3), (4))........................................................................ 14

    F. A significant variance is required to avoid unwarranted sentencing disparities (§ 3553(a)(6)). ................................................................................... 15

        1. Mark Janbakhsh's sentence should be, at most, closely related to the sentence of Ron Janbakhsh to avoid unwarranted disparities. ................. 15

        2. Courts routinely vary downward when the loss amount disproportionately aggravates the guidelines, and doing so here is necessary to avoid significant unwarranted disparities with other cases. ................................. 19

IV. CONCLUSION............................................................................................ 21

# I.    INTRODUCTION

Mark Janbakhsh has been a community leader, successful businessman, philanthropist, devoted husband, and father for decades. His story embodies the American dream: he is the eldest son of in a Persian family that fled Iran near the time of the Islamic Revolution. Building on his parents' sacrifices and hard work, he obtained an education and built successful businesses. And he used his success to help others—including the immigrant community where he grew up and across Nashville, the less fortunate who benefited from his charitable works, and the many employees and colleagues he mentored and helped to advance their own success. Above all, he was committed to his family, including his wife of over 30 years, four daughters, and a large extended family that now includes two grandchildren.

Against that backdrop in this case, Mark's position has been steadfast: he is deeply remorseful for the events that occurred, takes full responsibility as the leader of Auto Masters, and acknowledges his own poor judgment at times throughout events. But he contested that he was criminally liable for the loan-fraud scheme at the core of the indictment.

The jury found otherwise, and Mark accepts that he must face punishment based on that verdict. But that verdict should not overshadow the demonstrably admirable life that Mark has lived. Nor should it obscure the complex picture, often inconsistent testimony and speculative evidence (including the absence of the AMS database), and ultimately the close verdict at trial.

The question before the Court is how to balance those competing interests to reach an appropriate sentence. For the reasons discussed below, including the ample

justification for a downward variance under the 18 U.S.C. § 3553(a) factors, the Court should impose a modest sentence that mirrors to the sentence of Ron Janbakhsh who faces a 60-month maximum term.

The appropriateness of this sentence flows from two evaluations the Court must make. First, the Court must calculate the correct advisory U.S. Sentencing Commission Guidelines (the "guidelines") range. *Gall v. United States*, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").[1] And second, because the guidelines are just one sentencing factor, the Court must "consider all of the § 3553(a) factors," recognizing that it "may *not* presume that the Guidelines range is reasonable." *Gall*, 522 U.S. at 49–50 (italics added). Ultimately, the Court must fashion a sentence that is sufficient but not greater than necessary to comply with the purposes of § 3553(a). *See* 18 U.S.C. § 3553(a). Here, those factors support a significant variance and a modest sentence.

## II.     THE ADVISORY GUIDELINES RANGE.

The correct Guidelines range is 87–108 months for the reasons stated in the contemporaneously filed Position on PSR. But those Guidelines are not mandatory or "the only consideration" at sentencing. *Gall*, 552 U.S. at 49; *see also United States v.*

---

[1] Until recently that process would have included applying appropriate downward departures under the Guidelines, several of which are implicated here. But under the most recent amendments to the Guidelines, the guidelines no longer include "departures," instead cabining all such considerations under the § 3553(a) factors. *See* U.S.S.G. App. B (Part III) Compilation of Deleted Departure Provisions (2025) (last visited 1/15/26).

*Booker*, 543 U.S. 220, 246 (2005). And here, as discussed below, the Guidelines especially distort the relative culpability, requiring that they be dramatically discounted based on the other sentencing factors.

## III.    THE § 3553(a) FACTORS.

Courts are directed to do just that in appropriate cases. Specifically, they "must make an individualized assessment based on the facts presented." If based on the § 3553(a) factors, a court finds that a sentence within the advisory Guidelines range does not adequately serve the statutory sentencing purposes, it must impose a sentence that does. *See Nelson v. United States*, 555 U.S. 350, 351 (2009). As detailed below, the statutory factors in this case support a dramatic downward variance and at most a modest prison sentence.

### A.    The nature and circumstances of Mark Janbakhsh's offense warrant leniency (§ 3553(a)(1)).

Mark's offense was serious. But the "nature and circumstances" of that offense give context and distinguish it from the mine-run of cases, all of which warrants significant leniency at sentencing.

#### 1.    Mark has long taken full responsibility for the Auto Master's events even while contesting his criminal liability.

As the CEO of Auto Masters, Mark Janbakhsh was the company leader and lifeblood. And when he learned of the events that befell the company—albeit belatedly—he took responsibility and tried to correct them. As Mark has acknowledged, some of his immediate efforts to save Auto Masters were misplaced and reflected poor judgment. *See* Ex. 6 at 2 (**M. Janbakhsh Personal Statement**). But he has never shirked his responsibility. While he has contested that he was criminally liable for

what occurred, Mark has long accepted responsibility and taken extraordinary steps to right the ship. He agreed to a bankruptcy settlement that he personally guaranteed. He has repaid millions of dollars to address debts, many times what any other defendant contributed. And the commitment Mark has demonstrated has been recognized by many.

For example, U.S. Bankruptcy Judge Walker is the same bankruptcy judge who oversaw the Auto Masters bankruptcy and now oversees the Chapter 11 bankruptcy case involving Plaza Mariachi. At the hearing to approve the sale-leaseback of Plaza Mariachi, he commented: "The Court believes that what's before the Court is one hell of a resolution." *See* Ex. 7 at 34:4–7 (**12/3/25 Transcript,** ***In re Plaza Mariachi,*** **Case No. 24-02411 (Bkty. M.D. Tenn)**). Further, referencing the complicated history of the Auto Masters matter, Judge Walker called "the framework [for the sale] . . . pretty doggone good given the history of how we got here." Ex. 6 at 32. In addition, the buyer of Plaza specifically described Mark's desire to "seek redemption and do right by all parties" by selling his "landmark" property that serves so many. *See* Ex. 2 at 42 (**Wyatt Woeltje Ltr.**).[2]

None of this minimizes Mark's mistakes: He has acknowledged his shortcomings as a leader of the company and his ultimate responsibility. *See* Ex. 6 at 2. He further acknowledges that his attention was focused on building Plaza Mariachi, and

---

[2] Letters are organized into three compilation exhibits: Exhibit 1 from family and friends; Exhibit 2 from professional colleagues; and Exhibit 3 from community organizations regarding the Hispanic Family Foundation. Citations note the specific letter within each exhibit.

not on the details at Auto Masters. But his actions for over seven years show his full accountability and deep commitment to resolving the Auto Master issues.

### 2. The events reflect disorganized, decentralized conduct that Mark never led.

As the Court saw during the trial, the so-called "scheme" in this case was disorganized and decentralized. While the jury found Mark guilty of the offenses, that finding remains consistent with his failure to monitor others at Auto Masters and, ultimately, his deliberate ignorance. He disagrees with the finding of criminal liability, but the underlying evidence at trial remains the same. Under no scenario was he "in charge" or "leading" a fraudulent scheme. Rather, the misconduct was largely decentralized (as the varying and inconsistent renditions from the different defendants highlighted) and disorganized. In short, Mark should not be tarred with the misconduct of others—conduct that largely occurred unbeknownst to him and without his direct involvement.

### 3. Mark did not personally benefit from the ill-gotten funds, and funds indirectly obtained were not used for his personal gain.

This is not a case in which the defendant obtained ill-gotten funds and used them for a lavish lifestyle, become personally enriched, or to feed an addiction. The loans at issue were personally guaranteed by Mark Janbakhsh. Trial Transcript, Day 3 at 185–86. Unlike Ron Janbakhsh, whose individual "draws"—that is, payments to him personally—increased significantly due to his crime, *see* Trial Transcript, Day 4 at 186-87 (Ron Janbakhsh took $3,048,762 in distributions). Mark never took a larger personal draw. The loan overstatement does not represent funds that went to Mark

individually and, as noted below, grossly inflates the guidelines. Similarly, even those funds (and not necessarily funds directly attributable to the fraud) that indirectly benefited Mark were not used for personal gain. Funds were used for Auto Masters and, in some limited cases, to fund Plaza Mariachi, the cultural center that Mark built and that continues to serve Nashville's diverse community.

### 4. Mark has taken extraordinary steps, even before any criminal investigation, to repay the debts and resolve this matter.

To date, Mark has paid approximately $10 million toward the restitution in this case. But while significant on its own, that figure alone does not capture the extent of his steps to resolve this matter. In addition, he:

- Reached a settlement in the years long Auto Masters bankruptcy matter for $10,250,000. That settlement was personally guaranteed by Mark, and he has paid over 99% to date.
- Sold his family home of 20 years, the proceeds of which went to the settlement.
- Placed his cherished business, Plaza Mariachi, into Chapter 11 bankruptcy to facilitate a plan to raise funds for the settlement.
- Successfully reached an agreement for Plaza Mariachi that enabled $4.75 million to be contributed to the settlement.

Together, these efforts show, despite admitted errors, Mark's longstanding accountability and commitment toward resolving this matter.

### 5. Mark's admitted poor judgment in the wake of the bankruptcy reflected his desperate attempt to save his company—not to obstruct justice.

None of the above is to minimize Mark's admitted errors and poor judgment. His conduct in the weeks leading up to the Auto Master's bankruptcy was rash, desperate, and wrong. Motivated to save his company, he wrongly tried to suppress or

6

destroy certain evidence—a decision he deeply regrets. But those actions were borne of desperation related to saving his business, not an effort to obstruct justice. That underlying intent does not negate the wrongfulness of his actions but does place them in the proper context for considering the overall nature of the offense.

### B. Mark's personal history and characteristics are truly exemplary and justify significant weight at sentencing (§ 3553(a)(1)).

The next factor—"the history and characteristics of the defendant"—also warrants leniency in this case. Coming from humble beginnings, Mark started his enterprises from the ground-up, motivated not by ideas of self-gain or grandeur but by an innate desire to help others. *See* Ex. 6 at 1 (discussing his parents' struggles, his motivation, and desire to help others). This commitment to serving other people is fundamental to understanding Mark's history and is reflected by the outpouring of support in the letters (Ex. 1, 2) and video statements (Ex. 5).[3] This history demonstrates how aberrant this case is from his true character.

### 1. Mark has a long history of supporting those in need and helping others build their own successes.

Mark was born in Tehran, Iran in 1974 and immigrated to California with his parents when he was an infant. (PSR ¶ 72). In 1985, his family moved to South Nashville where his father worked in a hotel and his mother as a hairdresser. (PSR ¶ 73). He eventually graduated from Lighthouse Christian School in Antioch and then

---

[3] The video compilation was placed on a flash drive, which was filed with the Court and provided to the government along with an index. In addition, that same full video is available at https://youtu.be/cS1WYa7vykI (last visited 1/15/26). Where cited herein, the hyperlinks are to portions of the compilation as indicated in the segment title and timestamp.

earned a bachelor's degree in political science from Lipscomb University in 1995. (PSR ¶¶ 90–91).

After graduating from college and working for his father, he purchased a used car lot and started the company, Auto Masters, growing the business into twelve dealerships across Nashville. (PSR ¶ 93). Despite the success of Auto Masters, his goal was always to use this success to support his true passion: his non-profit work. In 2013, Mark and his wife of 30 years, Diane, started a non-profit organization called the Hispanic Family Foundation ("HFF"). (PSR ¶ 80). The HFF continues today to advocate for the Hispanic and immigrant communities of Nashville and devotes resources to improving their quality of life. In 2013, Mark purchased the property for Plaza Mariachi which he developed and opened in 2017. (PSR ¶ 93).

Throughout all aspects of his life, Mark serves as a pillar, offering support to those around him. Within his own family, he has always provided opportunities and shared in his professional successes. He brought his younger brother, Ron, into leadership at Auto Masters by making him another owner and operator of the business. He employed all four of his daughters (Tailah (28), Lexi (27), Brianna (21), and Chelsea (19) and their respective spouses at Plaza Mariachi. To this day, he continues to send money and care for his aging parents. Mark's youngest daughter, Chelsea, describes him as her "rock" and her "anchor." Ex. 1 at 4–5 (**Chelsea Janbakhsh Ltr.**).

Mark's support for others extends far beyond his own family. As reflected in the attached letters, he is more than a boss to his employees; he is a source of constant support and compassion. For example:

- Carolina Sanchez, a single mother who has worked for Mark for sixteen years describes how "[h]is help has meant far more than just a paycheck; it has been a true lifeline for me and my family." Ex. 2 at 1–2 (**Carolina Sanchez Ltr.**).

- Matzury Martinez, an employee at Plaza Mariachi writes how Mark made accommodations for his visual disability and "provided job opportunities to other people with disabilities." *Id.* at 10 (**Matzury Martinez Ltr.**).

- Lucia Cruz, a mother to a daughter with special needs who has worked for Mark for eight years describes how he grants her the "flexibility and support" when she needs to address her daughter's wellbeing. *Id.* at 11 (**Lucia Cruz Ltr.**).

- Alexander Niyigena, an employee at Plaza Mariachi details how he originally started working there as a cleaner, but with Mark's "trust and encouragement" he eventually worked his way up to becoming the IT Specialist. *Id.* at 12 (**Alexander Niyigena Ltr.**).

Mark also provides support professionally to fellow entrepreneurs, businesses, and organizations throughout Nashville. *See, e.g.*, *Id.* at 17–18 (**Leon Berrios Ltr.**) (noting that when starting his career in Nashville, "Mark was among the first to extend opportunities for collaboration and exposure, helping me integrate into the local professional community."); *Id.* at 19 (**Raymel Moleiro Ltr.**) (describing how Mark generously provided his cultural productions company with "spaces, equipment, lights, stage, ad logistical support at no cost."); *see also* Ex. 3 at 7 (**Kurdish American Community of Nashville Ltr.**) (letter written on behalf of the Kurdish American Community of Nashville describing how Mark's "dedication and generosity allowed our community to host a beautiful and memorable festival.").

Mark's selflessness also extends to those in need. For twenty years, Mark has facilitated volunteer work through his church, the HFF, and Plaza Mariachi. *See, e.g.*, Ex. 2 at 6 (**Thomas McSweeney Ltr.**) (describing how Mark became "involved in all

9

community-based events in early 2006."); *Id.* at 7 (**Eliazar Ochoa Ltr.**) (observing that due to "Mark's leadership and generosity, I along with many other women in the community, received essential items such as car seats, strollers, cribs, baby clothes, diapers, and more."); *see also* "Initiatives to support new mothers and struggling families" (Ex. 5 at 18:39); Ex. 2 at 11 (**Lucia Cruz Ltr.**) (describing back-to-school events orchestrated by Mark for families with limited resources); *Id.* at 16 (**Veronica Salcedo Ltr.**) (noting that "[d]uring the height of the COVID-19 pandemic, Mark helped provide meals for families struggling financially."). Mark's presence has a tangible effect on the community around him. *See* "Ron Hall testimonial" (Ex. 5 at 28:34).

> ### 2. Mark's personal and professional dealings reflect his good nature and genuineness—and the aberrant nature of his conduct in this matter.

The level of care with which Mark treats others has remained constant throughout his life. These acts in addition to his genuine nature stand as a testament to his true character. Also telling of Mark's good nature has been his behavior over the past few years. Instead of idly sitting back while those he once trusted left him to deal with the fallout of Auto Masters, he took the necessary steps to try and rectify the harm that had been done. In addition to taking ownership of the bankruptcy proceedings, he adjusted his business practices to ensure nothing similar could occur again. He resigned from his position as Chairman of the HFF to prevent the criminal investigation from tainting the organization. He, as described by his wife, "has worked tirelessly for eight years to pay off a settlement of over $10 million dollars." *See* "Diane Janbakhsh Testimonial" (Ex. 5 at 4:54). This conduct reflects Mark's propensity for addressing wrongdoing.

### 3. Mark's professional life—long pre-dating this matter—has been dedicated to diversity, Nashville's immigrant community, and serving others.

Nothing reflects Mark's dedication to supporting a cause larger than himself than Plaza Mariachi. Plaza Mariachi started as a dream to create a place where people of various ethnic, religious, and cultural backgrounds could gather and foster a sense of community. The Plaza opened in 2017 and has flourished under Mark's leadership. It not only houses the work of the HFF, but it also serves as a place for people of many walks of life to gather and learn from each other. It also employs over 600 people, creating a platform for individuals to start their own businesses and cross-collaboration among various cultural groups. *See* "[Plaza Mariachi introduction](#)" (Ex. 5 at 8:49). As described in detail in the letters and video, this work stems from Mark's dedication to serving the immigrant communities of Nashville and ensuring that their culture is not only preserved but shared. *See* "[Testimonials regarding impact of Plaza Mariachi](#)" (*Id.* at 25:13). Through his work with the HFF and Plaza Mariachi, Mark has had a tremendous impact on the community. *See* Ex. 4 (**Petition of Support**) (petition containing about one thousand signatures of individuals who have felt impacted by the work of HFF and Plaza Mariachi).

\* \* \* \*

In short, everything about Mark Janbakhsh's professional and personal history underscores the isolated nature of the misconduct in this case. Whether it be through his family, friends, church, employees, or volunteer work, Mark displays a rare, intrinsic desire to help others. The examples described above evidence this approach as one taken throughout his personal and professional life—

not a late-manufactured veneer for a court hearing. As Judge Rakoff poignantly noted, in a passage that applies with equal force here as it did that case:

> "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"

*See United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006).

Considering Mark's personal nature and characteristics, a modest sentence is warranted under § 3553(a)(1).

## C. A modest sentence, along with the consequences of a felony conviction, reflect the seriousness of the offense and other factors under § 3553(a)(2)(A).

A modest sentence for a first-time offender, along with the many collateral consequences of his conviction, reflect the seriousness of Mark's offense. He has already experienced numerous consequences due to the events in this case. In addition to the turmoil he and his family have faced, Mark's professional and personal reputation has been irreparably damaged. *See* "Diane Janbakhsh Testimonial" (Ex. 5 at 4:54) (describing how Mark has "shouldered this cloud of shame that has been over him."). As a result of this case, he also resigned as Chairman from the HFF. Despite the benevolent work he has contributed over decades, his felony convictions and their consequences will follow him for life.

12

Mark accepts those consequences while focusing on the future. Ex. 6 at 3 (**M. Janbakhsh Personal Statement**). Others have observed the same in him. For example, his daughter Tailah notes that he "is not a man who repeats the same mistakes—he learns from them, and he carries the weight of them with sincere repentance." Ex. 1 at 8–9 (**Tailah Scroggins Janbakhsh Ltr.**). This approach has remained constant, as evidenced by the efforts to repay debts and resolve this matter. *See* Parts III.A.1, 4 *supra*.

Taking these facts into perspective, along with the harsh reality of any sentence for non-violent, first-time offender, satisfies § 3553(a)(2)(A).

### D.    A modest sentence adequately deters crime, and there is no threat to the public (§ 3553(a)(2)(B), (C)).

Mark is obviously not a threat to the public—he has been on pre-trial release for over three years without incident—nor will he reoffend. He is a non-violent person and has no prior criminal history. Not only is he not a concern for public safety in the slightest, but his background shows that he is an extremely productive member of society who creates a positive impact on the communities around him.

Any further punishment will also provide both specific and general deterrent effect. Given the consequences he and his family have suffered thus far irrespective of the Court's sentence, Mark has been specifically deterred. Considering his age, he is also statistically less likely to offend compared to other defendants. *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (Commission's own

research showed that older offenders "were substantially less likely than younger offenders to recidivate.").

General deterrence will also be achieved by a modest sentence. The consequences of Mark's conviction and the damage it has done to his and his family's life provide a strong, general deterrent effect. A long sentence of imprisonment does nothing in terms of deterrence. *See United States v. Yeaman*, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes'); U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (Mar. 2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview ("[W]ith the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed."). Given these circumstances, anything more than a modest sentence would run against the statutory requirement that a sentence be "sufficient but not greater than necessary" to satisfy the § 3553(a) factors.

### E. The proposed sentence is appropriate for a non-violent, first-time offenders like Mark (§ 3553(a)(3), (4)).

A modest sentence is both available and appropriate under the circumstances. The Guidelines—which grossly distort the nature of this case, (*see* Part III.F below)—contemplate variances for cases like Mark's that involve notable "individual characteristics unrelated to the guideline provisions." U.S.S.G. Ch. 1 Pt. A (Introductory Commentary). In addition to being a non-violent, first-time offender with no risk of recidivism, Mark's personal background and the profound deterring effect of even a

modest sentence further supports this outcome. By contrast, a significant prison term runs counter to § 3553(a)'s requirement that sentences be "sufficient but not greater than necessary" and serves no practical purpose.

### F. A significant variance is required to avoid unwarranted sentencing disparities (§ 3553(a)(6)).

The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), demands a significant variance on two bases: (1) the relative culpability and conduct of Mark and Ron Janbakhsh *in this case* and (2) the potential disparities with defendants in *other fraud cases* in which courts dramatically vary below the guidelines.

### 1. Mark Janbakhsh's sentence should be, at most, closely related to the sentence of Ron Janbakhsh to avoid unwarranted disparities.

While a district court judge is not required to consider the disparity between sentences of co-defendants, the judge "may exercise his or her discretion and determine a defendant's sentence" considering a co-conspirator's sentence. *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir.2007). Differences in culpability and defendants' roles in a conspiracy are among the factors that may justify a sentencing disparity. *See United States v. Pasternak* 743 F. App'x. 612 (6th Cir. 2018) (upholding disparate sentences for co-conspirators due to varying levels of participation in conspiracy). When co-conspirators are similarly situated, courts have attempted to reduce disparities between their sentences. Here, those principles compel a comparison between Mark and Ron Janbakhsh and a sentence that appropriately reflects their relative roles in the offense and other § 3553(a) factors.

That comparison has two facets: (1) the relevant offense conduct in this case and (2) the broader evaluation of the § 3553(a) factors.

Regarding the offense conduct, Mark is, at worst, similarly situated to Ron and in some ways displays less aggravated conduct. For example, Ron Janbakhsh:

- owned 49% of his three car dealerships and exercised managerial control over their operations. Trial Transcript, Day 9 at pp. 79, 89.
- actively participated in the scheme shortly after its inception. *Id*. at pp. 101–02.
- did so voluntarily, motivated by financial difficulties related to his dealerships. *Id*. at pp. 102–03
- had independent incentive to engage in the fraud as his ability to draw against the Capital One loan was tied exclusively to his three dealerships. Trial Transcript, Day 3 at p. 45.

In addition, unbeknownst to Mark, Ron recruited his own employee, Will Pack, into the conspiracy. Trial Transcript Day 9 at p. 80. In practice, Ron Janbakhsh operated a parallel fraud at his dealerships alongside the fraud that Mark Janbakhsh failed to appreciate at his own dealerships. In anything, Ron's conduct is more aggravated due to longer length of his misconduct and being more directly involved in the mechanics of posting the fraudulent payments than Mark. *Id*. at pp. 109–10. In short, nothing in the record supports the conclusion that Ron was *less* culpable than Mark in the bank-fraud scheme, and Mark's sentence should reflect that fact.

Regarding the broader sentencing factors, the chart below reflects that the two defendants are quite different:

| Topic | Mark | Ron |
|---|---|---|
| Family background | Provider and leader for his entire extended family, supporting parents and family members | Consistent problem for family. In and out of trouble. Relied on handouts and support from others, especially older brother Mark. |
| Community and charitable good works | Decades of demonstrated good works, community service, and charity | None |
| Professional service | Built two highly successful businesses that served the Nashville immigrant community | Relied on his brother's good will for a role in those businesses and still chose to steal from them |
| Criminal history | No criminal history | Significant criminal record |
| Pretrial supervision | No issues on pretrial supervision | Pretrial violations |
| Role in scheme | A regrettable failure to supervise and conduct consistent only with deliberate ignorance conviction; not involved in Ron's initial fraud | Long time theft and fraudulent behavior, evidenced by multi-year text chain with Quiroz related to fraud |
| Use of ill-gotten funds | No direct money taken for personal benefit. No lavish lifestyle. | Millions taken for his personal benefit and used for "party" lifestyle of drugs, gambling, etc. |
| Repayment | Has paid approximately $10M toward settlement with Capital One | Has paid about $400K, which was in part funded by Mark's financial help. |
| Interaction with family | Longtime support of family members | Taken advantage of family's generosity. Stole cars from Auto Masters to start a shadow business in Florida and has co-opted his elderly mother as a "front" for those businesses, causing additional stress and legal problems. |
| This case | Took full responsibility and accountability for underlying conduct but contested | Pleaded guilty |

| Topic | Mark | Ron |
|-------|------|-----|
| | his criminal liability for loan fraud | |
| Cooperation | Not given any opportunity by the government to consider cooperation | Entered a cooperation plea agreement and testified at trial |

Ron Janbakhsh will rightly obtain the benefit of pleading guilty and cooperating. His liability is capped at 60 months' imprisonment, and he will likely receive, at most, a fraction of that. To be clear: that is entirely appropriate and just. But what is neither appropriate nor just is the potential dramatic disparity of several years difference in the sentence between the two. The benefits Ron rightly obtains for his cooperation should not overshadow Mark's relative role in the offense (the same or lesser than Ron) and his vastly more admirable traits under § 3553(a).

Other courts have addressed this issue. For example, in *United States v. Presley,* the district court granted a substantial downward variance from the guidelines range to avoid unwarranted sentencing disparity between co-conspirators. *See* 547 F.3d 625, 632 (6th Cir. 2008). The court's reasoning turned on the two co-conspirators' similar involvement in the criminal conduct. *Id.* at 631. But one defendant had previously received a below-guidelines sentence under an agreement with the government. *Id.* at 627. The court accounted for the potential disparity when sentencing the other defendant. *Id.* As the court explained, "it would violate the spirit of the guidelines and be particularly inequitable for [one defendant] to receive a 96-month sentence and [another defendant] a 360-month sentence for the same conduct." *Id.* at 631. To avoid that result, the court imposed a 240-month downward variance, which

the Sixth Circuit upheld. *Id.* at 632. For similar reasons, Mark and Ron Janbaksh's sentences should be closely related.

### 2. Courts routinely vary downward when the loss amount disproportionately aggravates the guidelines, and doing so here is necessary to avoid significant unwarranted disparities with other cases.

Courts in this and other circuits have recognized that reliance on the calculated loss amount can overstate the seriousness of the offense, justifying a substantially below-Guidelines sentence. This is particularly true where, as here, the loss amount is based largely or solely on an intended loss rather than actual harm. *See United States v. McBride*, 362 F.3d 360, 373 (6th Cir. 2004) (remanding for resentencing because a below guidelines sentence was warranted where scheme could not have resulted in the intended loss).

As Judge Rakoff has observed, mechanical application of the Guidelines in white-collar cases can produce disproportionately harsh sentences. He noted the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual loss" and explained that while the Guidelines did so "in an effort to appear 'objective'", they provide no justification for "accord[ing] such huge weight to such factors." *See Adelson*, 441 F. Supp. 2d at 509. Here, applying the loss-driven Guidelines range without regard to actual culpability or the nuances of the scheme would yield a sentence that is draconian and overstates the seriousness of the offense.

Consistent with Judge Rakoff's critique, courts in this Circuit have recognized that rigid adherence to PSR-derived loss calculations can overstate a defendant's culpability and warrant a downward variance. In *United States v. Jordan*, the district

court found that the probation office had overestimated the loss by millions of dollars and imposed a substantially below guidelines range. 544 F.3d 656, 673 (6th Cir. 2008). The court reduced the sentence to 48 months despite a guidelines range of 87–108 months, emphasizing the PSR's loss calculation did not accurately reflect the defendant's actual culpability. *Id*.

Similarly, in *United States v. Faulkenberry*, the district court, "[a]s has become common among district courts sentencing white-collar offenders in financial fraud cases," granted a substantial downward variance from a guidelines-recommended life sentence. 759 F. Supp. 2d 915, 928 (S.D. Oh. 2010). The court explained that "the harsh sentence recommended by the Guidelines is primarily driven by the loss calculation" and that "the loss calculation substantially overstates the gravity of the offense . . . ." *Id*. The court ultimately sentenced the lead defendant to 10 years' imprisonment in a case involving billions in losses to investors. *Id*.

Courts in other circuits have likewise acknowledged the risks of a mechanical application of the Guidelines in fraud cases and imposed substantial downward variances despite large loss amounts. *See, e.g., United States v. Ferguson*, 584 F. Supp. 2d 447 (D. Conn. 2008) (imposing sentences ranging from one day to four years for defendants' role in a  $500 million fraud, despite Guidelines range of life in prison); *United States v. Rostoff*, 53 F.3d 398 (1st Cir. 1995) (affirming substantially below-guidelines range where district court found "the amount of loss overstated the seriousness of the particular defendant's criminality.").

Here, that same result is especially justified for several reasons. First, the loss amount substantially overstates the severity of the harm. The guideline range is driven almost entirely by a 20-point intended loss enhancement. Relying so heavily on this single factor to determine the sentence would be manifestly unjust. That effect is doubly pernicious because of the specific speculative nature of the loss. Simply put, even if the "loss" can suffice for mechanical application of the guidelines, it is still highly suspect. As the Court knows from extended briefing, there are serious questions about the government's failure to preserve the AMS database and, more so, the ability to know the true loss without that data. Defendant's own consultants, including an industry financial expert and an AMS representative, raise serious doubts as to the reliability of the so-called loss amount. *See* Ex. 8 (**Chad Martin Declaration**); Ex. 9 (**Jeff Molloch Declaration**). And as admitted at trial, no actual audit was ever performed. The result is a loss figure that should be heavily discounted because, beyond its sheer size, it is demonstrably unreliable.

Under these circumstances, a downward variance is warranted to ensure a sentence that is proportionate, just, and consistent with Mark's conduct.

## IV. CONCLUSION

For all the reasons set forth above, Mark Janbakhsh respectfully request that the Court grant his motion for a significant downward variance. The guidelines grossly overstate the seriousness of the offense and Mr. Janbakhsh's relative culpability. A significant variance is required to meet the goals of § 3553(a) specifically reflecting his exemplary community service for decades, his status as a first-time of-

fender, the varying evidence and close verdict at trial, and to avoid an unjust sentencing disparities. For those and all the reasons stated above, Mr. Janbakhsh respectfully requests the Court impose a modest sentence.

Respectfully submitted,

*/s Ty E. Howard*
Ty E. Howard (No. 26132)
thoward@bradley.com
Ocasha Musah (No. 39224)
omusah@bradley.com
Bradley Arant Boult Cummings LLP
ONE 22 ONE
1221 Broadway, Suite 2400
Nashville, TN 37203
(615) 252-2376

*s/ John R. Glover*
J. Alex Little (TN BPR #29858)
alex@litson.co
John R. Glover (TN BPR #37772)
jr@litson.co
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37201
615-985-8205

22

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, I caused the electronic filing of the foregoing document with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing on the following:

Chris Suedekum
Office of the United States Attorney
719 Church Street
Nashville, TN 37203

Jodie Bell
501 Union Street, Suite 525
Nashville, TN 37219

Further notice regarding Exhibit 5:  Exhibit 5 is a video compilation available via hyperlink in the foregoing document. An additional copy of Exhibit 5 was placed on a thumb drive and filed with the Clerk of Court with a copy served on the parties. *See* Local Administrative Order 205.

*/s/ Ty E. Howard*
Ty E. Howard